No. 26-1099

# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,

*Plaintiff-Appellant*,

v.

AARON M. FREY, in the official capacity as Attorney General of the State of Maine; ROBERT L. CAREY, in the official capacity as Superintendent of the Bureau of Insurance,

*Defendants-Appellees*.

—————————————

On Appeal from the United States District Court for the District of Maine, No. 1:25-cv-00469-JCN

—————————————

## PLAINTIFF-APPELLANT'S OPENING BRIEF

—————————————

ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
PHILIP HAMMERSLEY[*]
CAMILO GARCIA[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

[*] Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Plaintiff-Appellant*

March 2, 2026

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Plaintiff-Appellant Pharmaceutical Research and Manufacturers of America certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES.......................................................................... iv

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ........................... 1

INTRODUCTION ...................................................................................... 1

JURISDICTION........................................................................................ 4

STATEMENT OF THE ISSUES .................................................................. 4

STATEMENT OF THE CASE...................................................................... 4

    A.     Legal Background .................................................................... 4

    B.     Factual and Procedural Background ........................................ 9

    C.     The District Court's Decision................................................ 17

SUMMARY OF ARGUMENT...................................................................... 18

LEGAL STANDARD ................................................................................ 21

ARGUMENT ........................................................................................... 22

I.     PhRMA Is Entitled To Preliminary Relief...................................... 22

    A.     The Supremacy Clause Itself Displaces Chapter 103 ....................... 22

        1.     Chapter 103 unconstitutionally discriminates against drug manufacturers with whom the federal government deals................................................................................ 25

        2.     Chapter 103 unconstitutionally regulates the federal government directly .................................................. 35

        3.     Chapter 103 unconstitutionally invades the federal government's exclusive prerogative to set conditions on federal spending programs.................................. 39

    B.     The 340B Statute Preempts Chapter 103 .......................... 42

1.       Chapter 103 is field preempted ................................................. 42

2.       Chapter 103 is conflict preempted ............................................ 44

C.      The Remaining Factors Favor Injunctive Relief ................................ 53

CONCLUSION ...................................................................................... 55

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

*AbbVie Inc. v. Drummond*,
2025 WL 3048929 (W.D. Okla. Oct. 31, 2025)........................................... 12, 44

*AbbVie Inc. v. Fitch*,
2024 WL 3503965 (S.D. Miss. July 22, 2024) ...............................................44

*AbbVie, Inc. v. Murrill*,
2026 WL 350685 (5th Cir. Feb. 9, 2026)........................................................44

*Arizona v. Bowsher*,
935 F.2d 332 (D.C. Cir. 1991) .......................................................................40

*Arizona v. California*,
283 U.S. 423 (1931)........................................................................................39

*Arizona v. United States*,
567 U.S. 387 (2012)........................................................................................42

*Astra USA, Inc. v. Santa Clara Cnty.*,
563 U.S. 110 (2011) .................................................................................. *passim*

*Banco Nacional de Cuba v. Sabbatino*,
376 U.S. 398 (1964)........................................................................................39

*Barnett Bank v. Nelson*,
517 U.S. 25 (1996)..........................................................................................45

*Boeing Co. v. Movassaghi*,
768 F.3d 832 (9th Cir. 2014)..................................................................... 36, 38

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988).................................................................... 24, 36, 39

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001)................................................................................ *passim*

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
596 U.S. 107 (2022)........................................................................................25

*Clearfield Tr. Co. v. United States*,
   318 U.S. 363 (1943) ........................................................................40

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*,
   48 F.3d 618 (1st Cir. 1995) ...........................................................55

*CoreCivic, Inc. v. Governor of N.J.*,
   145 F.4th 315 (3d Cir. 2025) ................................................ 23, 35

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) ........................................................................44

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
   596 U.S. 212 (2022) ................................................................. 7, 46

*Cunningham v. Neagle*,
   135 U.S. 1 (1890) ............................................................................24

*Cuomo v. Clearing House Ass'n, L.L.C.*,
   557 U.S. 519 (2009) ........................................................................48

*Dist. 4 Lodge v. Raimondo*,
   40 F.4th 36 (1st Cir. 2022) ............................................................21

*Eli Lilly & Co. v. Kennedy*,
   2025 WL 1423630 (D.D.C. May 15, 2025) .............................. 49, 53

*English v. Gen. Elec. Co.*,
   496 U.S. 72 (1990) ..........................................................................44

*Forest Park II v. Hadley*,
   336 F.3d 724 (8th Cir. 2003) ........................................... *passim*

*GEO Grp., Inc. v. Newsom*,
   50 F.4th 745 (9th Cir. 2022) .............................................. 22, 23, 24

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013) ......................................................54

*Horne v. Dep't of Agric.*,
   576 U.S. 350 (2015) ..........................................................................6

*Hughes v. Talen Energy Mktg., LLC*,
  578 U.S. 150 (2016)........................................................24

*Int'l Paper Co. v. Ouellette*,
  479 U.S. 481 (1987)........................................................45

*Johnson v. Maryland*,
  254 U.S. 51 (1920)................................................ 23, 24, 35, 46

*Kansas v. Garcia*,
  589 U.S. 191 (2020)........................................................22

*Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*,
  469 U.S. 256 (1985)................................................ 40, 46

*Lee v. Bickell*,
  292 U.S. 415 (1934)........................................................54

*Leslie Miller, Inc. v. Arkansas*,
  352 U.S. 187 (1956)................................................ 27, 36

*Massachusetts v. U.S. Dep't of Transp.*,
  93 F.3d 890 (D.C. Cir. 1996) ........................................24

*Mayo v. United States*,
  319 U.S. 441 (1943)........................................................35

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819)........................................23

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992)........................................................54

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012)........................................................7

*New York ex rel. Bank of Com. v. Comm'rs of Taxes*,
  67 U.S. (2 Black) 620 (1862)........................................24

*New York v. Trump*,
  133 F.4th 51 (1st Cir. 2025) ........................................54

*Nken v. Holder,*
556 U.S. 418 (2009)..................................................................21

*North Dakota v. United States,*
495 U.S. 423 (1990) .......................................................... 26, 27

*Novartis Pharms. Corp. v. Johnson,*
102 F.4th 452 (D.C. Cir. 2024) ...................................... *passim*

*Off. of Pers. Mgmt. v. Richmond,*
496 U.S. 414 (1990)..................................................................39

*Osborn v. Bank of the United States,*
22 U.S. (9 Wheat.) 738 (1824)..................................................27

*Pennhurst State Sch. & Hosp. v. Halderman,*
451 U.S. 1 (1981)........................................................ 40, 41, 46

*Phillips Chem. Co. v. Dumas Indep. Sch. Dist.,*
361 U.S. 376 (1960)..................................................................27

*PhRMA v. McClain,*
95 F.4th 1136 (8th Cir. 2024)...................................................44

*PhRMA v. Morrisey,*
760 F.Supp.3d 439 (S.D. W. Va. 2024) ................................. 44, 51

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. Dep't of Health,*
699 F.3d 962 (7th Cir. 2012)....................................................46

*Reeside v. Walker,*
52 U.S. (11 How.) 272 (1850)...................................................39

*Rust v. Sullivan,*
500 U.S. 173 (1991)..................................................................40

*Sanofi Aventis U.S. LLC v. HHS,*
58 F.4th 696 (3d Cir. 2023)........................................... *passim*

*Sindicato Puertorriqueno de Trabajadores v. Fortuno,*
699 F.3d 1 (1st Cir. 2012) .......................................................21

*Sperry v. Florida ex rel. Fla. Bar,*
    373 U.S. 379 (1963)................................................................45

*Tex. Indus., Inc. v. Radcliff Materials, Inc.,*
    451 U.S. 630 (1981)................................................................39

*United States v. City of Arcata,*
    629 F.3d 986 (9th Cir. 2010)................................................25

*United States v. King County,*
    122 F.4th 740 (9th Cir. 2024)................................................28

*United States v. Locke,*
    529 U.S. 89 (2000)................................................................48

*United States v. Standard Oil Co.,*
    332 U.S. 301 (1947)................................................................39

*United States v. Washington,*
    596 U.S. 832 (2022)............................................... *passim*

*Wyeth v. Levine,*
    555 U.S. 555 (2009)................................................................24

*Zschernig v. Miller,*
    389 U.S. 429 (1968)................................................................24

**Constitutional Provision**

U.S. Const. art. VI, cl. 2 ................................................... 22

**Statutes**

42 U.S.C. §256b(a)(1)................................................... 5, 42, 45

42 U.S.C. §256b(a)(4)................................................... 6, 7, 42

42 U.S.C. §256b(a)(5)................................................... 8, 42, 53

42 U.S.C. §256b(d) ................................................................42

42 U.S.C. §256b(d)(3)................................................................49

42 U.S.C. §1320f-2(d)................................................................50

42 U.S.C. §1320f-3(a) .................................................................50

42 U.S.C. §1396r-8(a)(1) ...............................................................5

42 U.S.C. §1396r-8(a)(5) ...............................................................5

5 M.R.S.A. §209 .......................................................................16

24-A M.R.S.A. §12-A ..................................................................16

24-A M.R.S.A. §211 ...................................................................16

24-A M.R.S.A. §214 ...................................................................16

24-A M.R.S.A. §7752(5) ...............................................................16

24-A M.R.S.A. §7752(6) ........................................................... 16, 26

24-A M.R.S.A. §7752(7) ...............................................................16

24-A M.R.S.A. §7753 ..................................................................26

24-A M.R.S.A. §7753(1) ...............................................................15

24-A M.R.S.A. §7753(2) ........................................................... 16, 50

24-A M.R.S.A. §7753(3) ...............................................................15

24-A M.R.S.A. §7757(1) ...............................................................16

**Regulations**

42 C.F.R. §10.21 ........................................................................9

42 C.F.R. §10.21(a)(1) .................................................................53

42 C.F.R. §10.23 ........................................................................9

42 C.F.R. §10.23(c) .....................................................................9

61 Fed. Reg. 43,549 (Aug. 23, 1996) .............................................. 9, 10

61 Fed. Reg. 65,406 (Dec. 12, 1996) ............................................. 8, 9, 49

75 Fed. Reg. 10,272 (Mar. 5, 2010) .................................................10, 11

89 Fed. Reg. 28,643 (Apr. 19, 2024) ........................................ 37

**Other Authorities**

Amicus Br. of Conn., et al., *Sanofi-Aventis U.S., LLC v. HHS*,
2022 WL 1617655 (3d Cir. May 16, 2022) ........................................14

Ctrs. for Medicare & Medicaid Servs., *Medicare Drug Pricing
Negotiation Final Guidance* (Oct. 2, 2024),
https://perma.cc/Q8KB-LLYE ........................................50

Ctrs. for Medicare & Medicaid Servs., *NHE Fact Sheet*
(June 24, 2025), https://perma.cc/W944-TZH7........................................5

CVS, Annual Report (Form 10-K) (2024),
https://perma.cc/J5GD-WB5H........................................13

Adam J. Fein, *New HRSA Data: 340B Program Reached
$29.9 Billion in 2019*, Drug Channels (June 9, 2020),
https://perma.cc/B759-WJTZ ........................................11

H.R. Rep. No. 102-384(II) (1992) ........................................6, 8

HHS Off. of Sec'y, Advisory Opinion No. 20-06, *Contract
Pharmacies Under the 340B Program* (Dec. 30, 2020),
https://perma.cc/7SAM-VBML ........................................14

HRSA, OMB No. 0915-0327, Sample PPA Addendum,
https://tinyurl.com/yt6xuk3f (last visited March 2, 2026)........................................6

HRSA, *Program Integrity: FY25 Audit Results* (July 25, 2025),
https://perma.cc/F25F-M6P5 ........................................37

HRSA, *Request for Information: 340B Rebate Model Pilot Program*,
https://perma.cc/K762-V3F3 ........................................51

Joint Mot. for Vacatur and Remand, *Am. Hosp. Ass'n v. Kennedy*,
No. 2:25-cv-600 (D. Me. Feb. 5, 2026)........................................51

Majority Staff Rep. of S. Comm. on Health, Educ., Lab. & Pensions,
*Congress Must Act to Bring Needed Reforms to the 340B Drug
Pricing Program* (2025), https://perma.cc/C83U-VRPX........................................10

Minn. Dep't of Health, *340B Covered Entity Report* (2024),
https://perma.cc/Z7KV-CF2U ................................................................12

Order, *Am. Hosp. Ass'n v. Kennedy*, No. 2:25-cv-600
(D. Me. Dec. 29, 2025) ......................................................................51

William Sarraille et al., IQVIA, *Do 340B Contract Pharmacies Really
"Increase Access" for 340B Patients?* (2025),
https://perma.cc/JW35-4CJ4 ............................................................. 48

State of Maine Dep't of Health & Human Servs., *Discontinuation of
Coverage: Xifaxan (Rifaximin)\** (Sep. 18, 2025),
https://perma.cc/7JEH-9LVF ...........................................................34

U.S. Gov't Accountability Off., GAO-18-480, *Drug Discount
Program: Federal Oversight of Compliance at 340B Contract
Pharmacies Needs Improvement* (2018), https://perma.cc/BK6S-
WG5M ...............................................................................................11

*U.S. Patient Assistance Program (PAP)*, Bausch Health,
https://perma.cc/XTJ5-Z6EV (last visited Mar. 2, 2026) ..................34

Walgreens, Annual Report (Form 10-K) (2024),
https://perma.cc/YFA8-HNPE .........................................................13

Aaron Vandervelde et al., *For-Profit Pharmacy Participation in the
340B Program* (2020), https://perma.cc/365X-UXGY .....................11

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

Under Federal Rule of Appellate Procedure 34(a)(1) and First Circuit Rule 34.0(a), Plaintiff-Appellant Pharmaceutical Research and Manufacturers of America respectfully submits that oral argument would assist the Court in resolving this appeal, which presents important questions about the extent to which state legislatures may regulate and modify the terms of participation in a federal program.

## INTRODUCTION

This case is about the constitutional balance between state and federal power. Congress created a federal healthcare initiative called the 340B Program ("340B" or "Program") to provide certain non-profit healthcare providers with access to reduced-priced medicines. The 340B Program is federal from top to bottom. Congress created the Program using its Article I spending power, enticing pharmaceutical manufacturers to sign up by making participation in 340B a condition of having the federal government spend federal dollars reimbursing their drugs under Medicare and Medicaid. Congress carefully defined the scope—and limits—of manufacturers' obligations under the Program and the universe of providers entitled to reduced pricing under it (known as "covered entities"). Congress gave a federal agency exclusive power to administer and enforce the Program. And, in stark contrast to cooperative federalism programs like Medicaid, Congress assigned no role to the states.

For years, the program worked as Congress intended. But things started to change around 2010, when covered entities began contracting with for-profit pharmacy chains at skyrocketing rates and extending to them benefits that Congress confined to a carefully circumscribed group of non-profit healthcare providers—drastically increasing the risk of fraud and abuse in the Program. Many manufacturers individually responded to those alarming developments by requiring

covered entities who want to purchase their drugs at sharply reduced 340B prices to agree to contract with no more than one outside pharmacy, and to share basic information about transactions for which 340B pricing is sought so manufacturers could verify they were actually eligible for that pricing.

Both federal courts of appeals to consider these contract-pharmacy and claims-data conditions held that the 340B statute gives manufacturers discretion to impose those kinds of reasonable conditions on their offers to sell drugs to covered entities at 340B prices—and, accordingly, that the federal agency tasked with administering the Program could not prohibit them. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703-04 (3d Cir. 2023). But contract pharmacies and their allies in state legislatures refused to take no for an answer, and a host of states responded by enacting laws that attempt to reshape the 340B Program to their liking.

Chapter 103 of Maine's Insurance Code is one such effort. Chapter 103 prohibits manufacturers that participate in the 340B Program from imposing the very contract-pharmacy and claims-data conditions on their offers to sell drugs at 340B prices that two circuits have held federal law permits. By requiring manufacturers to sell 340B-priced drugs to covered entities that refuse to accede to those terms, Chapter 103 thus compels manufacturers to sell their drugs at reduced prices in circumstances where Congress did not. More troubling still, Chapter 103 targets

only manufacturers that participate in the 340B Program.  Every other manufacturer remains free to sell—or not sell—its drugs on whatever reasonable terms it desires.  In short, the whole and sole point of Chapter 103 is to alter manufacturers' obligations under the federal 340B Program.

That violates the Supremacy Clause.  The Supreme Court has consistently held that the Constitution itself displaces state laws that single out the federal government or those with whom it deals for special burdens, directly target the federal government, or intrude in an area of uniquely federal interest.  Chapter 103 does all those things.  It singles out manufacturers for burdensome regulation only if they have chosen to participate in the federal 340B Program.  It deprives the federal government of the ability to set the terms of its agreements with those program participants, and forces the federal agency that administers 340B to police tens of thousands of entities and transactions—while depriving manufacturers of the ability to identify potential program violations.  And it wrests control from the federal government over the contours of a federal spending program.  Chapter 103 thus violates the Supremacy Clause at every turn.

Chapter 103 is also preempted by the 340B statute.  The 340B Program "originates from, is governed by, and terminates according to federal law." *Buckman Co. v. Plaintiffs' Legal Comm*., 531 U.S. 341, 347 (2001).  Chapter 103 unlawfully inserts the state into that federally defined field.  Chapter 103 also impedes the

operation of the 340B Program in practice.  It imposes on manufacturers obligations that Congress did not.  It makes it virtually impossible for manufacturers to avail themselves of the procedures Congress created to aid them in detecting and addressing fraud and abuse in the 340B Program.  And it injects Maine into the exclusively federal administrative enforcement regime Congress created.

PhRMA sought preliminary relief to prevent Maine's unconstitutional law from disrupting the *status quo* and harming its members.  The district court's refusal to grant that relief rested on a misunderstanding of the relevant legal principles, the record, and Maine's law.  This Court should reverse.

## JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §1331.  The court denied PhRMA's motion for a preliminary injunction on January 23, 2026.  Add.1a.  PhRMA filed a notice of appeal on January 27, 2026.  Appx.196.  This Court has jurisdiction under 28 U.S.C. §1292(a)(1).

## STATEMENT OF THE ISSUES

Whether the district court erred in denying PhRMA's motion for a preliminary injunction.

## STATEMENT OF THE CASE

### A. Legal Background

1. Every year, the federal government spends more than $100 billion on prescription drugs through federal healthcare programs.  *See* Ctrs. for Medicare &

Medicaid Servs., *NHE Fact Sheet* (June 24, 2025), https://perma.cc/W944-TZH7. Although the federal government typically does not purchase prescription drugs directly, it uses federal funds to reimburse drugs purchased by healthcare providers and furnished to Medicaid or Medicare beneficiaries. Participants in those two federal programs collectively account for "almost half the annual nationwide spending on prescription drugs." *Sanofi*, 58 F.4th at 699. Manufacturers cannot sell their drugs on that federally funded market unless they agree to participate in Medicaid and Medicare Part B, which comes with many strings. *See* 42 U.S.C. §1396r-8(a)(1). As relevant here, a manufacturer also must agree to participate in the 340B Program, *see id.* §§256b(a)(1), 1396r-8(a)(5), which "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities," *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011).

Manufacturers that agree to participate in 340B must execute a contract with the federal government known as a Pharmaceutical Pricing Agreement, or PPA. *Astra*, 563 U.S. at 115; *see* Appx.132-40 ("Sample PPA"). Tracking the 340B statute, the PPA defines the manufacturer's rights and duties under the Program. The core command under both the 340B statute and the PPA is that manufacturers must "offer" certain drugs "for purchase at or below the applicable ceiling price," which is typically steeply discounted—indeed, sometimes as low as a penny per pill. 42 U.S.C. §256b(a)(1); *see* HRSA, OMB No. 0915-0327, Sample PPA Addendum,

https://tinyurl.com/yt6xuk3f (last visited March 2, 2026). The manufacturer must extend that offer to "covered entit[ies]," a statutorily designated list of 15 types of non-profit healthcare providers. Sample PPA Addendum at 1; *see* 42 U.S.C. §256b(a)(4) (listing entities).

While those covered entities typically serve a high volume of vulnerable and low-income patients, and manufacturers must offer to sell them reduced-price drugs under 340B, covered entities do not have to pass on the cost savings to their patients. They are instead free under the Program to sell to patients at full price drugs that they purchased at the 340B price, and then pocket the difference. The 340B Program is thus designed to help covered entities "stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384(II), at 12 (1992).

Though the PPA "incorporate[s]" the manufacturer's statutory "obligations and record[s] [its] agreement to abide by" them, *Astra*, 563 U.S. at 118, PPAs are nevertheless a foundational element of the 340B Program. Indeed, 340B could not exist without them. Congress did not create the 340B Program through its ordinary lawmaking power, which imposes obligations on regulated entities involuntarily. It almost certainly could not have, as forcing manufacturers to sell their drugs at steeply reduced prices would raise serious constitutional concerns. *See Horne v. Dep't of Agric.*, 576 U.S. 350 (2015). Congress instead enticed manufacturers to

6

enter the 340B Program with the promise of access to the all-important federal Medicaid and Medicare Part B markets. The 340B Program thus is designed to "operate[] based on consent," *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022), with the PPA memorializing the manufacturer's agreement to participate. Underscoring their contractual nature, PPAs include "nonrenewal and termination" provisions that entitle manufacturers to exit the Program "for any reason," and state that they "shall be construed in accordance with Federal common law." Sample PPA, Appx.137, 139 (formatting altered).

Because manufacturer participation in Medicare, Medicaid, and 340B rise and fall together, Congress must ensure that the benefits of participation in Medicare and Medicaid outweigh the burdens of participation in 340B—and prevent either from becoming unduly coercive. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581-82 (2012). That is why, among other things, Congress circumscribed the universe of entities eligible for reduced prices. No for-profit entities appear on the statutory list of covered entities. 42 U.S.C. §256b(a)(4).

The 340B Program also imposes obligations on covered entities to prevent them from exploiting manufacturers. Because covered entities can purchase drugs at steeply reduced prices, they could profit enormously from selling those reduced-price drugs to third parties at full price and pocketing the margin. Congress thus commanded that covered entities "shall not resell or otherwise transfer the drug to a

person who is not a patient of the entity," a practice known as diversion.  *Id.* §256b(a)(5)(B).  Congress also forbade covered entities from generating "duplicate discounts," i.e., forcing a manufacturer to pay a Medicaid rebate on a drug that was purchased at a reduced price under the 340B Program.  *Id.* §256b(a)(5)(A).  And Congress made covered entities that engage in either of those practices liable to manufacturers for the amount of their ill-gotten gains.  *Id.* §256b(a)(5)(D).  Together, the prohibitions against diversion and duplicate discounts are intended to "assure the integrity of the drug price limitation program."  H.R. Rep. No. 102-384(II), at 16.

2. Congress vested the U.S. Department of Health and Human Services ("HHS") with the responsibility to administer and enforce the 340B Program.  HHS in turn delegated that responsibility to the Health Resources and Services Administration ("HRSA").  HRSA oversees two critical components of the 340B statute's enforcement regime:  audits and dispute resolution.

The auditing process allows both HRSA and drug manufacturers to review a covered entity's records to verify that it is not diverting drugs or generating duplicate discounts.  *See* 42 U.S.C. §256b(a)(5)(C).  But a manufacturer can "conduct an audit only when it has documentation which indicates that there is reasonable cause" to believe that a covered entity violated those statutory prohibitions.  61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996).  HRSA guidelines set a high bar to conduct an audit:  Manufacturers must produce a detailed audit plan that "set[s] forth a clear

description of [their] reasonable cause," identifies "sufficient facts and evidence," and supplies supporting documentation.  *Id.* at 65,410.

Armed with whatever evidence the audit uncovers—assuming a manufacturer can meet the prerequisites for conducting an audit—manufacturers present their evidence of program violations to an administrative dispute resolution ("ADR") panel, which decides whether the covered entity violated the statutory prohibitions against diversion or duplicate discounting.  *See* 42 C.F.R. §§10.21, 10.23.  The agency's final decision in these ADR proceedings is subject to judicial review in federal court.  *See id.* §10.23(c).

## B.    Factual and Procedural Background

1. Congress designed 340B to operate only through certain non-profit healthcare providers; pharmacies were not given any role in, or entitled to any benefits under, the Program.  Some covered entities, however, ran into a logistical problem:  Not all of them had an in-house pharmacy through which they could dispense drugs, whether acquired at 340B prices or otherwise, to their patients.  61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996).

To remedy that problem, HRSA issued guidance in 1996 authorizing each covered entity to contract with one outside pharmacy to dispense 340B-priced drugs to its patients.  That guidance allowed a covered entity to purchase the 340B-priced drugs but have them delivered to and dispensed by the pharmacy, so long as the

pharmacy was contractually the covered entity's "agent," and the covered entity retained title to the drugs at all times. *Id.* at 43,550, 43,555. Although the guidance allowed all covered entities to enter into a contractual arrangement with one pharmacy, HRSA emphasized that "the use of contract services [would] only provid[e] those covered entities (which would otherwise be unable to participate in the program) a process for accessing 340B pricing." *Id.* at 43,550, 43,551. HRSA responded to concerns about diversion by stressing that manufacturers could "detect and eliminate" abuse through audits and the ADR process. *Id.* at 43,553.

2. In 2010, HRSA abruptly "swerved." *Novartis*, 102 F.4th at 457. For the first time, it took the position that covered entities could contract with an unlimited number of outside pharmacies to dispense 340B-priced drugs, without regard to the proximity of the pharmacy to the covered entity (and its patients). 75 Fed. Reg. 10,272 (Mar. 5, 2010). The number of outside pharmacies contracting with covered entities soon soared from roughly 1,300 in 2010 to upwards of 30,000. *See* Majority Staff Rep. of S. Comm. on Health, Educ., Lab. & Pensions, *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program* 3 (2025), https://perma.cc/C83U-VRPX. As of 2020, the average covered entity was contracting with 22 pharmacies—and passing along to major pharmacies like Walgreens and CVS a share of the revenue it brought in from securing insurance reimbursements at or near full price for drugs purchased at a 340B discount. *See*

10

Aaron Vandervelde et al., *For-Profit Pharmacy Participation in the 340B Program* 7 (2020), https://perma.cc/365X-UXGY. These arrangements increased the number of 340B price reductions claimed by covered entities far beyond any corresponding increase in their patient base. *See* Adam J. Fein, *New HRSA Data: 340B Program Reached $29.9 Billion in 2019*, Drug Channels (June 9, 2020), https://perma.cc/B759-WJTZ.

Federal watchdogs warned that the explosion of contract pharmacies heightened the potential for diversion and abuse in the 340B Program. U.S. Gov't Accountability Off., GAO-18-480, *Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* 43-45 (2018), https://perma.cc/BK6S-WG5M ("2018 GAO Report"). HRSA audits reveal that contract pharmacies have accounted for nearly two-thirds of documented cases of diversion since that explosion began. *Id.* at 44. That stems in part from covered entities' failure to adequately oversee their contract pharmacies. *See id.* at 43-44. Despite HRSA's admonitions that "the covered entity" must be "ultimately responsible for assuring full compliance with 340B," 75 Fed. Reg. at 10,276, nearly one in three entities audited by the agency "had no documented processes for conducting contract pharmacy oversight," 2018 GAO Report, *supra*. And because neither covered entities nor their contract pharmacies are required to pass along to patients the savings they realize from the 340B Program, *see AbbVie Inc. v.*

*Drummond*, 2025 WL 3048929, at *1 (W.D. Okla. Oct. 31, 2025), both have strong incentives to classify as many transactions as possible as 340B eligible.

The so-called product "replenishment model" that pharmacies use to acquire and dispense 340B-priced drugs on behalf of covered entities makes it even easier for them to do so. Under that model, contract pharmacies sell drugs from their general inventories to all customers at prices significantly above the 340B price, without making any inquiry into who is or is not a patient of a covered entity. After those transactions occur, the pharmacies use undisclosed algorithms that purport to retroactively identify customers that have some relationship with a covered entity. The pharmacies then use the covered entity's 340B status to replenish their inventory with drugs purchased at the 340B price. The covered entity, in turn, shares with the pharmacy part of the margin between the full-retail-price sale that the pharmacy made and the reduced price that the covered entity paid. *See* Appx.32-35 ¶¶71-79.

All of this has proven extraordinarily profitable for major for-profit pharmacies. As reflected in a recent report, approximately $1 out of $6 of gross revenue by covered entities nationwide went to contract pharmacies and third-party administrators, who run the black-box algorithms to find allegedly 340B-eligible patients. *See* Minn. Dep't of Health, *340B Covered Entity Report* 9 (2024), https://perma.cc/Z7KV-CF2U. Both CVS and Walgreens, two of the largest for-profit retail pharmacies in the country, have publicly disclosed that 340B profits are

material to their finances—and that a reduction in 340B contract-pharmacy arrangements "could materially and adversely affect" their bottom lines. CVS, Annual Report (Form 10-K) at 23 (2024), https://perma.cc/J5GD-WB5H; *accord* Walgreens, Annual Report (Form 10-K) at 30 (2024), https://perma.cc/YFA8-HNPE.

3. Eventually, drug manufacturers—including many of PhRMA's members—individually started trying to address these concerns by imposing conditions on the sale of their drugs to covered entities at 340B prices. Although there were variations in these policies, two conditions became common features: Many manufacturers individually began requiring covered entities seeking to purchase their drugs at 340B prices to agree to contract with no more than one outside pharmacy to dispense the drugs (and, under some manufacturers' policies, only if they did not have an in-house pharmacy), as HRSA originally envisioned, *see* pp.9-10, *supra*, and provide claims data about the transactions for which they claim 340B pricing, so the manufacturer can verify that no diversion or duplicate discounting has occurred.

In 2021, HRSA informed manufacturers that it believed that those conditions violated the federal 340B statute and manufacturers' obligations under their PPAs. *See Novartis*, 102 F.4th at 458-59. HRSA took the position that manufacturers could not impose *any* conditions on their offers to sell drugs at 340B prices, and that covered entities could contract with as many pharmacies as they choose—whether it is "a neighborhood pharmacy" or, as the agency itself put it, a hypothetical

pharmacy located on "the lunar surface."  HHS Off. of Sec'y, Advisory Opinion

No. 20-06, *Contract Pharmacies Under the 340B Program* 2-3 (Dec. 30, 2020),

https://perma.cc/7SAM-VBML.

Litigation ensued over whether manufacturers could lawfully impose the

contract-pharmacy and claims-data conditions on their 340B offers, with several

states—including Maine—supporting HRSA's position that they could not.  *See,*

*e.g.*, Amicus Br. of Conn., et al., *Sanofi-Aventis U.S., LLC v. HHS*, 2022 WL 1617655

(3d Cir. May 16, 2022).  Once the dust settled, manufacturers emerged victorious.

Both federal circuits to weigh in on the issue unanimously agreed that federal law

entitles manufacturers to impose the conditions that HRSA claimed were unlawful.

*See Novartis*, 102 F.4th at 459-64; *Sanofi*, 58 F.4th at 703-06.[1]  Those decisions

explained that the federal 340B statute preserves a manufacturer's right to impose

reasonable terms on its 340B offer—including restrictions on how many contract

pharmacies a covered entity may use and requirements that covered entities supply

claims data relating to 340B-priced drugs.  *Novartis*, 102 F.4th at 459-64; *Sanofi*, 58

F.4th at 703-06.  While both courts noted that refusing to allow a covered entity to

use even *one* contract pharmacy may be so restrictive as to violate the obligation to

---

[1] Judge Ambro dissented in part in *Sanofi*, but he joined the portions of the majority's analysis relevant here.  *See* 58 F.4th at 707-08 (Ambro, J., concurring in part and dissenting in part).

make a *bona fide* offer to sell drugs at 340B prices, both courts emphatically rejected HRSA's position that the 340B statute forbids manufacturers from imposing the kinds of conditions manufacturers had been imposing.

4. Dissatisfied with the federal outcomes to date, covered entities and their contract pharmacy partners turned to lobbying states. Over the past few years, they began persuading states to pass laws that seek to mandate under *state* law what the Third and D.C. Circuits held *federal* law does not require. In particular, these laws make it illegal for manufacturers who participate in the 340B Program to condition their offers to sell drugs at 340B prices on a covered entity's agreement to use no more than one contract pharmacy and to provide claims data.

Maine's Chapter 103 operates in exactly that manner. It provides that a manufacturer "may not deny, restrict, prohibit[,] or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B contract pharmacy on behalf of a 340B entity." 24-A M.R.S.A. §7753(1). It further prohibits "interfer[ing] directly or indirectly with a 340B entity unless expressly authorized by the United States Department of Health and Human Services." *Id.* §7753(3). And it bars manufacturers from "[r]equir[ing] a 340B entity to submit any claims or utilization data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity unless the claims or utilization data sharing is required by the United States Department of Health and

15

Human Services." *Id.* §7753(2). Maine's Attorney General and the Superintendent of Maine's Bureau of Insurance are empowered to enforce Chapter 103. *See id.* §7757(1); *id.* §§12-A, 211, 214; 5 M.R.S.A. §209.

Chapter 103 is entirely parasitic of the federal 340B Program. It defines "340B drug" to mean "a drug that is purchased or eligible for purchase under Section 340B of the federal Public Health Service Act, 42 [U.S.C. §]256b(a)(3)." *Id.* §7752(6). It defines "340B contract pharmacy" as "a pharmacy that has a contract with a 340B entity to receive and dispense 340B drugs to the 340B entity's patients on behalf of the 340B entity." *Id.* §7752(5). And it defines a "340B entity" as "an entity participating or authorized to participate in the federal 340B drug discount program, as described in 42 [U.S.C. §]256b." *Id.* §7752(7). Chapter 103 thus regulates participation in the 340B Program overtly and exclusively: It makes it illegal for manufacturers that participate in that federal program to refuse to sell drugs at the federally set 340B price to federally recognized covered entities that will not agree to contract-pharmacy and claims-data terms that manufacturers are entitled under federal law to impose. The ultimate effect of Chapter 103 thus is to force manufacturers who participate in the 340B Program to sell their drugs at 340B prices in situations where they would not have to do so but for Maine's law.

16

## C.    The District Court's Decision

To prevent this direct assault on the federal 340B Program from harming its members, PhRMA filed this lawsuit against Maine's Attorney General and the Superintendent of Maine's Bureau of Insurance.  PhRMA's complaint alleges that Chapter 103 is foreclosed by the Supremacy Clause itself, is preempted by the 340B statute, and directly regulates wholly out-of-state commerce in violation of the Commerce Clause.  Appx.11-60.  Shortly after bringing suit, PhRMA moved for a preliminary injunction, seeking relief solely on its Supremacy Clause and preemption arguments.  D.Ct.Dkt.14.  The district court denied that motion after a hearing, concluding that PhRMA is unlikely to succeed in showing either that the Supremacy Clause itself or the 340B statute displaces Chapter 103.  Add.12a-36a.

As for PhRMA's argument under the Supremacy Clause directly, the district court acknowledged the bedrock rule that states cannot "regulate[] the United States directly or discriminate[] against the Federal Government or those with whom it deals" without "clear and unambiguous authorization" from Congress.  Add.12a-13a.  But the court held that Chapter 103 does not directly regulate the United States because it "does not place any tax, prohibition, or mandate on the federal government or its functions."  Add.13a.  The court next concluded that Chapter 103 does not violate the Supremacy Clause's anti-discrimination rule either, positing that drug manufacturers "do not fall within any of the recognized categories of entities with

17

whom the government 'deals' for purposes of" the Supremacy Clause. Add.14a. Even if they did fall within one of those categories, moreover, the court concluded that there was not any "discernible discrimination because the state statute does not make … distinctions among the participants," and that any such discrimination would not be unlawful anyway because the "additional rules for 340B participants" are not "sufficiently burdensome to support a finding that Maine seeks to improperly favor nonparticipating manufacturers over participating manufacturers." Add.15a.

The district court also rejected the argument that PhRMA is likely to succeed in proving that the 340B statute preempts Chapter 103. Add.17a-36a. The court refused to find field preemption after concluding that the 340B statute's "silence regarding the acts and transactions required to accomplish the objectives of the 340B program" leaves room for states to regulate. Add.20a. And it rejected PhRMA's conflict-preemption arguments because it concluded that the presumption against preemption applies and is not overcome. Add.21a-36a.

## SUMMARY OF ARGUMENT

The basic question in this case is whether a state may impose its own obligations on participation in a federal program that is crafted by Congress and operated exclusively by the federal government. The answer is no. A contrary ruling would upend the constitutional hierarchy enshrined in the Supremacy Clause, deprive Congress of control over exclusively federal programs, and put

manufacturers participating in the federal 340B Program in the untenable position of providing significant price concessions not required by federal law or else violating an unconstitutional state law.

The Supreme Court has long held that the Supremacy Clause—separate and apart from any statute Congress has enacted—displaces state laws and preserves national sovereignty in three circumstances. Each is implicated here. First, Chapter 103 runs afoul of the Supremacy Clause because it unlawfully singles out those with whom the government has chosen to deal for special state-law obligations. Chapter 103's sole reason for existence is to compel manufacturers in the 340B Program (but no one else) to sell their drugs to covered entities at 340B prices even when those entities refuse to accede to conditions that the 340B Program permits manufacturers to impose. Second, Chapter 103 impermissibly regulates the federal government itself by redefining the terms of manufacturers' PPAs—federal contracts between the government and manufacturers, governed by "Federal Common Law," Sample PPA, Appx.139—and forcing HRSA to monitor thousands of additional transactions involving contract pharmacies for fraud and abuse. It is Chapter 103 alone that forces HRSA to devote its scarce resources to policing the additional entities that Maine has ushered into the federal 340B Program—entities that have already been proven to pose a much higher risk of diversion and duplicate discounting. The Supremacy Clause prevents states from foisting on federal agencies obligations that

19

Congress has not. Third, Chapter 103 intrudes on an area of uniquely federal interest because it encroaches on the federal government's exclusive interest in creating and clearly defining the limits of its spending programs.

Those principles suffice to show that PhRMA is likely to succeed on the merits. Simply put, the district court's contrary holding rests on strained distinctions and flawed logic that cannot be reconciled with precedent or bedrock principles of constitutional law.

The court's rejection of those Supremacy Clause arguments alone was error, but the rest of its decision is also wrong on its own terms, as Chapter 103 is plainly preempted by the 340B statute, too. State law is preempted when it intrudes on an exclusive federal field or stands as an obstacle to federal law. Chapter 103 does both. By dictating when and under what conditions participating manufacturers must offer to sell their drugs at the 340B price, and creating its own regime to enforce those commands, the law injects Maine into a federal program where Congress gave it no role to play. Worse still, Chapter 103 impedes Congress's objectives thrice over: It prohibits manufacturers from imposing the very conditions on their federal 340B offers that they are entitled to impose under the federal 340B statute; it makes it effectively impossible for manufacturers to obtain the data needed to access the federal dispute resolution process Congress set up for 340B-related disputes; and it

intrudes on the federal-enforcement regime that Congress tasked HRSA alone with administering.

In short, regardless of which route this Court takes, PhRMA is likely to succeed on the merits. By greenlighting Maine's effort to take over the 340B Program and drive up manufacturers' cost for participating, the decision below threatens to upend the hierarchy embedded in the Supremacy Clause and protected by countless Supreme Court decisions. And because Chapter 103 forces PhRMA's members to comply with an unconstitutional law and threatens serious financial harm, PhRMA is entitled to preliminary relief. This Court should reverse.

## LEGAL STANDARD

To obtain a preliminary injunction, a movant must establish that it is "likely to succeed on the merits," that it (or its members) will "suffer irreparable harm in the absence of preliminary relief," that "the balance of equities tips in his favor," and that "an injunction is in the public interest." *Dist. 4 Lodge v. Raimondo*, 40 F.4th 36, 39 (1st Cir. 2022). The last two factors "merge when," as here, "the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 420 (2009). The denial of a preliminary injunction is generally reviewed for abuse of discretion, but "issues of law are reviewed de novo." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam).

## ARGUMENT

## I. PhRMA Is Entitled To Preliminary Relief.

The Constitution and duly enacted federal statutes are "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. So, when state and federal law conflict, "federal law takes precedence." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020). While most Supremacy Clause cases involve arguments that a state law invades a field reserved by or conflicts with a federal statute (field and conflict preemption, respectively), the Supremacy Clause *itself* also forecloses some types of state laws, with no action by Congress (sometimes known as "intergovernmental immunity"). Chapter 103 flunks both doctrines. In our constitutional system, "state statutes may not interfere with the implementation of a federal program by a federal agency." *Forest Park II v. Hadley*, 336 F.3d 724, 732 (8th Cir. 2003). Yet that is precisely what Chapter 103 does, inserting Maine into a "relationship [that] originates from, is governed by, and terminates according to federal law," *Buckman*, 531 U.S. at 347, and discriminating against manufacturers solely because of their relationship with the federal government, to boot. PhRMA is thus likely to succeed on the merits.

### A. The Supremacy Clause Itself Displaces Chapter 103.

The Supreme Court has long held that the Supremacy Clause directly prohibits states from "'requir[ing] qualifications' for those doing government work 'in addition to those that the Government has pronounced sufficient.'" *GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 754 (9th Cir. 2022) (en banc) (quoting *Johnson v.*

22

*Maryland*, 254 U.S. 51, 57 (1920)). This doctrine, sometimes referred to as "intergovernmental immunity," operates separate from "preemption" under any particular federal statute. *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 321 (3d Cir. 2025). While statutory preemption may be more commonly invoked, there is nothing novel about this distinct doctrine. In fact, it "traces its origin to *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 [(1819)]." *GEO Grp.*, 50 F.4th at 754.

In *McCulloch*, the Supreme Court struck down Maryland's effort to tax a federally chartered bank because it would have interfered with the federal government's exercise of its sovereign powers. As Chief Justice Marshall explained, the Supremacy Clause itself deprives states of the power, "by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the [national] government." 17 U.S. (4 Wheat.) at 436. The "very essence of supremacy" is that the federal government can operate within its constitutionally assigned domain free from direct state regulation. *Id.* at 427. The hierarchy embodied by the Supremacy Clause and inherent to national sovereignty thus forbids states from interfering with the federal government's ability to exercise its constitutionally enumerated functions. *Id.* Ever since *McCulloch*, the Supreme Court has consistently invalidated state action that violates that hierarchy, with or without any federal statute evincing Congress's intention to invoke that background

rule. *See, e.g.*, *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504-13 (1988); *Zschernig v. Miller*, 389 U.S. 429, 432-41 (1968); *Johnson*, 254 U.S. at 56-57; *Cunningham v. Neagle*, 135 U.S. 1, 58 (1890); *New York ex rel. Bank of Com. v. Comm'rs of Taxes*, 67 U.S. (2 Black) 620, 628-35 (1862).

Because the Constitution itself prohibits laws that violate that hierarchy, congressional intent plays a different role in this context than in statutory preemption cases. When a litigant argues that a federal statute preempts state law, courts must treat "the purpose of Congress" embodied in the relevant statute as "the ultimate touchstone." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016). To determine that purpose, courts examine the statute, typically with a presumption that Congress generally does not intend to displace state law in areas of traditional state concern. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). That presumption, however, is simply a "canon of statutory construction" that courts use to aid their interpretive determination whether a federal statute preempts state law. *Massachusetts v. U.S. Dep't of Transp.*, 93 F.3d 890, 895 (D.C. Cir. 1996). So it necessarily has no role to play in determining whether the Constitution itself forecloses a state law, as the question in that context is whether states have the power to enact the law at issue in the first place, not whether Congress has chosen to preempt a power that states already possess. *See GEO Grp.*, 50 F.4th at 761-62. Indeed, a presumption against preemption would be nonsensical in that context, for when the Supremacy Clause

itself forecloses a particular type of state action, states by definition lack any traditional historical power to take that kind of action. Congressional intent thus comes into play only if a state argues that some federal statute gives states a power the Supremacy Clause denies—which Congress can do, but must do "clear[ly] and unambiguous[ly]." *United States v. Washington*, 596 U.S. 832, 839-40 (2022).

The Supremacy Clause itself nullifies state laws in three circumstances. States cannot enact laws that single out "the Federal Government or those with whom it deals" for special obligations or prohibitions. *Id.* at 838. States cannot directly regulate or impose burdens on the operations of the federal government. *Id.* And states cannot intrude on the federal government's core powers by regulating areas of uniquely federal interest. *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 116 (2022). In each of these settings, the structural principle that states cannot control or impede federal operations suffices on its own—without an act of Congress—to nullify contrary state laws unless Congress expressly says otherwise. *Washington*, 596 U.S. at 838.

Chapter 103 violates each of these principles.

> **1. Chapter 103 unconstitutionally discriminates against drug manufacturers with whom the federal government deals.**

a. Chapter 103 "specifically target[s] and restrict[s] the conduct" of drug manufacturers if—and only if—they participate in the federal 340B Program. *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010). Chapter 103 does

not impose obligations or restrictions on all drug manufacturers that do business in the state. It instead applies only to the sale and distribution of a "340B drug," a term that it defines by reference to the federal 340B Program set forth in 42 [U.S.C. §]256b. 24-A M.R.S.A. §7752(6). Chapter 103 thus imposes requirements on drug manufacturers *only* if they participate in the federal 340B Program. *E.g.*, *id*. §7753. If a manufacturer does not participate in that program, then Chapter 103 leaves it free to sell its drugs to healthcare providers that qualify as "covered entities" under the 340B Program on the same terms as it would sell them to anyone else. Chapter 103 thus targets the federal program exclusively. Indeed, that is the entire point: Maine wants manufacturers who participate in the federal 340B Program to have to extend the steeply reduced prices available under that Program to covered entities in circumstances where Congress does not require them to do so.

That runs headlong into the Supremacy Clause, which prohibits states from singling out "the Federal Government or those with whom it deals" and regulating "them unfavorably on some basis related to their governmental status" unless Congress "clearly and unambiguously permit[s]" them to do so (which no one claims Congress has done here). *Washington*, 596 U.S. at 838-39. That "nondiscrimination rule finds its reason in the principle that the States may not directly obstruct the activities of the Federal Government." *North Dakota v. United States*, 495 U.S. 423, 437-38 (1990) (plurality op.). And it is not confined to laws that single out the

federal government itself, as "a regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself." *Id.* at 438. The Supreme Court thus has held time and again that states may not "control" federal operations by directly regulating—let alone singling out for special obligations—private parties who are partnering with the federal government to advance federal objectives. *Washington*, 596 U.S. at 838-39; *see also, e.g.*, *Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 377-78, 387 (1960); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 189-90 (1956) (per curiam); *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738, 786-89, 866-67 (1824).

*Washington* is instructive. There, the federal government was involved in cleanup efforts on a federal tract of land located in Washington State known as the Hanford site. "Most of the workers involved in the cleanup process [were] federal contract workers—people employed by private companies under contract with the Federal Government." 596 U.S. at 836. Washington enacted a workers' compensation law that "applied only to Hanford site workers 'engaged in the performance of work, either directly or indirectly, for the United States.'" *Id.* That law made it "easier for federal contract workers at Hanford to establish their entitlement to workers' compensation." *Id.* Though "all parties … agree[d] … that the statute applie[d] only to federal contract workers and not to federal employees,"

the Court unanimously held that it violated the "nondiscrimination principle." *Id.* at 836, 841. By "treating federal [contract] workers differently than state or private workers," the law had the practical effect of "singling out the Federal Government for unfavorable treatment," foisting costs upon its contracts (and, by extension, the government itself) costs "that state or private entities do not bear." *Id.* at 839.

The Ninth Circuit recently invalidated a similar scenario in *United States v. King County*, 122 F.4th 740 (9th Cir. 2024). That case involved an executive order issued by a local government that forbade private businesses operating at a county airport from "providing … services to enterprises engaged in the business of deporting immigration detainees (except for federal government aircraft)." *Id.* at 748. As a result of the order, multiple businesses that had contracted with ICE to facilitate deportations had to cease providing services to the federal agency. *See id.* at 749, 756-57. The court held that the executive order "discriminates against the United States" by treating "contractors who serve ICE charter flights 'differently' from those who do not." *Id.* at 757. That conclusion did not turn on the strength of the federal interest in immigration regulation. It instead turned on the fact that the only entities affected by the law were the federal government and those with whom it contracted, which violates the "anti-discrimination principle." *Id.*

*Forest Park II* reflects the same principles. That case involved a federal spending program Congress created to promote low-income housing. The

Department of Housing and Urban Development ("HUD") "enticed private developers" to build and maintain affordable multi-family housing by offering them loans with below-market interest rates. 336 F.3d at 728. In exchange for these federally subsidized mortgages, developers agreed to provide tenants with more affordable housing. *Id.* To encourage participation, HUD allowed developers to buy out the mortgages early, thus exiting the federal program and eliminating their obligation to provide pricing concessions. *Id.* The program gave no role to the states. Nevertheless, Minnesota decided to enact its own restrictions to make it more difficult for developers who participated in the federal program to buy out their mortgages and exit the program. *Id.* at 730.

Although the "unique federal laws and programs involved in [the] case ma[d]e it difficult to apply a traditional preemption analysis," the Eighth Circuit had no difficulty concluding that Minnesota's law violated the Supremacy Clause. As the court explained, "[a] private participant in a federal housing program who seeks to withdraw from participation pursuant to the provisions of that program … is being prohibited by a state law from taking the action that the federal government has otherwise authorized." *Id.* at 731-32. And while Minnesota's law directly regulated only the private participants, it had the practical effect of forcing "the federal government to continue to provide financial assistance to the participant when both the federal government and the participant have chosen to end their relationship."

*Id.* at 732. The law thus operated *exclusively* to "regulate or restrict the actions of" both private participants and even "the federal government under its own federal program." *Id.* That, the court concluded, Minnesota could not do.[2]

Like the provisions in those cases, Chapter 103 imposes unique burdens on manufacturers that have entered contracts with the federal government to provide drugs to certain entities at reduced prices, even though nothing in the 340B statute authorizes states to do so. The moment a manufacturer joins 340B by executing a PPA, it incurs state-law obligations that do not apply to drug manufacturers that have not entered into a partnership with the federal government through the 340B Program. And the moment that relationship with the federal government ends, so too do the manufacturer's state-law obligations under Chapter 103.

Chapter 103 thus imposes unanticipated costs on manufacturers, who must now sell their drugs at 340B prices when they otherwise would not. That, in turn, imposes unanticipated costs on the federal government itself, which not only risks disincentivizing manufacturers from participating in the 340B Program on account of the burdens Maine has added to participation in that federal program, but now

---

[2] To be sure, the court "also" held in the alternative that "the federal statutes and regulatory scheme" at issue there "impliedly preempt the state statutes because the state statutes conflict with the federal law." *Forest Park II*, 336 F.3d at 732. But it did so only *after* holding that the Supremacy Clause itself displaced the challenged state law. *See id.* at 731-32.

requires the federal government to police for diversion and duplicate discounting transactions that would not exist but for Chapter 103. That is textbook discrimination against the federal government and those whom it has chosen to deal.

b. The district court's contrary conclusion is wrong at every turn. According to the court, manufacturers that participate in the 340B Program "do not fall within any of the recognized categories of entities with whom the government 'deals' for purposes of intergovernmental immunity, such as employees, contract workers, suppliers, or instrumentalities." Add.14a. That is not the law. Not a single case supports the conclusion that the protections of the intergovernmental immunity doctrine apply only to certain narrow "categories of entities" with whom the federal government deals. Add.14a. Quite the opposite: The Supreme Court has broadly applied that doctrine to all manners of private entities with whom the federal government has entered into an agreement to accomplish federal objectives. *See* p.27, *supra*. And rightly so, as strictly confining the doctrine to federal employees or procurement contractors would defeat its core purpose. The point of the doctrine is to protect the federal government's efforts to achieve federal ends, not to protect some particular subset of private parties it enlists in aid of those efforts. *See* pp.26-28, *supra*. It would make no sense to deprive the federal government of that protection just because it chooses to accomplish its ends via a partnership with private parties through a spending power program instead of through "employees,

31

contract workers, suppliers, or instrumentalities." Add.14a. The relationship HRSA has with drug manufacturers is therefore entitled to just as much protection from state interference as any other federal contractual arrangement.

Regardless, manufacturers that participate in 340B fit comfortably within the categories the district court cited. Manufacturers who participate in 340B must execute a federal contract with HRSA, the PPA, in which both counterparties "agree" to undertake certain obligations. Sample PPA, Appx.134-35. As relevant here, that contract mandates that the manufacturer "offer" its drugs to third parties at reduced prices—*i.e.*, agree to offer to sell drugs to covered entities at certain prices. Sample PPA Addendum, *supra*. Assent to that obligation in turn renders the manufacturer's drugs eligible for federal reimbursement under Medicaid and Medicare. *See Novartis*, 102 F.4th at 455. The PPA contains notice, termination, and nonrenewal terms that are the hallmark of typical contracts. Appx.132-39. That manufacturers agree to offer to sell their reduced-price drugs to private entities, rather than to the federal government itself, has no bearing on the constitutional analysis. What matters is that manufacturers must do so because of their contractual obligation to the federal government—which *advances the federal interest enshrined in the 340B statute of providing reduced-price drugs to safety-net healthcare providers*. Allowing states to interfere with that arrangement simply because the federal government is not the provider or recipient of the reduced-price drugs would punish

the federal government for choosing to achieve its objectives by channeling the sale of drugs through private parties rather than through federal instrumentalities.  The Supremacy Clause does not tolerate that outcome.

It likewise makes no difference that PPAs "are not ordinary 'transactional, bargained-for contracts.'" *Contra* Add.14a.  The Supremacy Clause's protections do not turn on whether the obligations that private parties voluntarily undertake to achieve federal interests were the result of a form contract, a bargained-for contract, or some other privity relationship entirely.  *See* p.27, *supra* (collecting cases).  What matters is that there is a federal-private partnership to achieve a federal objective.  That is precisely what 340B is.  States thus cannot single out for special burdens the manufacturers that participate in that federal program.

The district court tried to sidestep that problem, positing that PhRMA failed to identify "a relevant or workable set of comparators" that are treated better than the drug manufacturers that participate in the 340B Program. Add.15a.  But PhRMA clearly identified the comparators in its briefing:  Maine treats drug manufacturers differently based solely on their participation in the 340B Program.  D.Ct.Dkt.33 at 2-7.  Under the Chapter 103, manufacturers that participate in the 340B Program lose the ability to impose certain conditions on their offers to sell drugs; manufacturers that do not participate in the 340B Program retain the authority to impose the same conditions.  *See* pp.25-26, *supra*.  The district court did not dispute

that; it just deemed it irrelevant because it did not think that there are any "nonparticipating drug manufacturers doing business in Maine." Add.15a. That, however, is simply incorrect. Bausch Health, for example, no longer participates in the 340B Program and still sells its products in Maine. *See U.S. Patient Assistance Program (PAP)*, Bausch Health, https://perma.cc/XTJ5-Z6EV (last visited Mar. 2, 2026); State of Maine Dep't of Health & Human Servs., *Discontinuation of Coverage: Xifaxan (Rifaximin)\** (Sep. 18, 2025), https://perma.cc/7JEH-9LVF. As a result, there is simply no disputing that Maine treats manufacturers worse if they have contracted with the federal government to carry out a federal mission, but better if they have not. That is discrimination, plain and simple.

As a last-ditch effort to avoid that conclusion, the district court posited that even if discrimination against federal contractors exists here, the "additional rules for 340B participants are [not] sufficiently burdensome to support a finding that Maine seeks to improperly favor nonparticipating manufacturers over participating manufacturers." Add.15a. That is both irrelevant and wrong. Discrimination against the federal government or parties contracted with the federal government to carry out a federal mission violates the Supremacy Clause, full stop, no matter the magnitude of the burden the discriminatory law imposes. *See Washington*, 596 U.S. at 838-39. Maine could not levy a $1 tax solely on those parties and defend that discrimination as a de minimis intrusion on federal sovereignty. Nor can it defend

Chapter 103 as imposing minimal (yet discriminatory) burdens on those with whom the federal government has partnered to advance a federal mission. In all events, even if it mattered how burdensome Maine's discriminatory law is, the record confirms that Chapter 103 imposes substantial burdens on PhRMA's members. PhRMA submitted sworn evidence that, by prohibiting manufacturers that participate in the 340B Program from imposing contract-pharmacy and claims-data conditions on their offers to sell 340B-priced drugs, Chapter 103 forces manufacturers to incur "substantial, non-recoverable costs." Appx.75-76. Indeed, that is the whole point.

### 2. Chapter 103 unconstitutionally regulates the federal government directly.

Chapter 103 also violates the Supremacy Clause command that "the activities of the Federal Government [must be] free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943); *see also CoreCivic*, 145 F.4th at 325. While that rule is often stated in terms of directly regulating the federal government itself, it too extends to private parties when they are engaged in carrying out federal objectives—even if state regulation does *not* single out those federal activities alone (as it does here). States thus may not force federal postal workers to obtain a state driver's license before delivering mail in the state, *Johnson*, 254 U.S. at 55-57, demand that federally owned facilities obtain state operating permits, *see Hancock v. Train*, 426 U.S. 167, 178-81 (1976), or require federal contractors to comply with

additional state-imposed requirements before completing their contractual duties, *see Leslie Miller*, 352 U.S. at 188-90.

Chapter 103 violates this rule twice over. First, it unlawfully "overrid[es] federal contracting decisions" by forcing drug manufacturers who want to continue participating in the 340B Program to sell drugs at 340B prices when federal law does not require them to do so. PPAs are federal contracts, and as such are "governed exclusively by federal law." *Boyle*, 487 U.S. at 504. Absent clear congressional authorization, then, states have no power to add to manufacturers' obligations under their PPAs or the 340B statute. *Washington*, 596 U.S. at 835. But Chapter 103 does exactly that. A manufacturer must now refrain from making contract-pharmacy or claims-data conditions part of its federal "offer"—even though it is free under federal law to include them, *see Novartis*, 102 F.4th at 463-64; *Sanofi*, 58 F.4th at 703-06. So a manufacturer's obligations under the 340B Program are now effectively as follows: The "manufacturer shall offer … covered outpatient drugs for purchase at or below the applicable ceiling price, **and its offer may not include contract-pharmacy or claims-data conditions**." That impermissibly "regulates … the effective terms of [the] federal contract itself" by "mandat[ing] the ways in which [manufacturers] rende[r] services" for which "the federal government" has contracted. *Boeing Co. v. Movassaghi*, 768 F.3d 832, 840 (9th Cir. 2014).

Second, Chapter 103 substantially expands HRSA's responsibilities under the 340B Program. Stripping manufacturers of the ability to limit the number of contract pharmacies with which covered entities in the 340B Program can partner creates more work for HRSA, because it adds tens of thousands of entities and transactions that the agency must monitor and audit to ensure compliance with the prohibitions on diversion and duplicate discounting. 89 Fed. Reg. 28,643, 28,644 (Apr. 19, 2024). HRSA's most recent audits confirm the need for close monitoring of contract pharmacies, *see* HRSA, *Program Integrity: FY25 Audit Results* (July 25, 2025), https://perma.cc/F25F-M6P5; pp.11-12, *supra*. Maine's law amplifies the need for close agency oversight—especially since it perversely strips manufacturers of the ability to secure the claims data that enables them to identify potential violations, as Congress intended. *See* pp.48-51, *infra*. HRSA thus must devote more of its scarce resources to shouldering the regulatory burdens that come with monitoring thousands of contract pharmacies, overburdening an already overstretched federal agency. All of that is a product of Maine's decision to alter the terms of a federal program, not any decision by the federal government.

Once again, that makes Maine's law not meaningfully different from the law the Eighth Circuit invalidated in *Forest Park II*. As the court explained there, the Supremacy Clause does not permit states to "interfere with the implementation of a federal program by a federal agency." 336 F.3d at 728. That is so regardless of

whether a state accomplishes that forbidden end by regulating the federal government itself, or by (as in *Forest Park II*) regulating program participants in ways that foist additional burdens and costs on the federal government. Either way, the state unlawfully "regulates or restricts the actions of the federal government under its own federal program." *Id.* By forcing drug manufacturers who participate in the federal 340B Program to take on additional obligations that increase both their own burdens and the burdens on HRSA, that is precisely what Chapter 103 does.

The district court did not meaningfully engage with this argument. It simply declared that PhRMA's argument "lacks merit" because Chapter 103 "does not place any tax, prohibition, or mandate on the federal government or its functions." Add.13a. But the direct-regulation prohibition applies not just to direct regulation of the federal government, but also to direct regulation of those carrying out federal functions. *See Boeing*, 768 F.3d at 839-40. Moreover, by regulating what conduct manufacturers may engage in as they perform their contractual obligations to the federal government, Maine's law burdens not just manufacturers, but HRSA itself. That is just as much direct regulation of the execution of federal functions as a law that directly regulates the federal government itself.

**3. Chapter 103 unconstitutionally invades the federal government's exclusive prerogative to set conditions on federal spending programs.**

Chapter 103 also intrudes on an enclave of "uniquely federal interests." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 426 (1964). An area qualifies as "uniquely federal," separate and apart from any field a federal statute may create or reserve, if it is "committed by the Constitution and laws of the United States to federal control." *Boyle*, 487 U.S. at 504. In areas where "the authority and duties of the United States as sovereign are intimately involved," *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981), "[t]he United States may perform its functions without conforming to the police regulations of a state," *Arizona v. California*, 283 U.S. 423, 451 (1931); *see also Buckman*, 531 U.S. at 347.

The federal government plainly has a "uniquely federal interes[t]" in appropriating federal funds because the Constitution "commit[s]" the spending power "to federal control." *Boyle*, 487 U.S. at 504. Congress serves as "the custodian of the national purse." *United States v. Standard Oil Co.*, 332 U.S. 301, 314 (1947). "[N]ot a dollar" of federal monies can be spent without federal approval. *Reeside v. Walker*, 52 U.S. (11 How.) 272, 291 (1850). By giving Congress that power, the Constitution ensures that "public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990).

As the Supreme Court explained long ago, "[w]hen the United States disburses its funds …, it is exercising a constitutional function or power" that is "in no way dependent" on the law of any state. *Clearfield Tr. Co. v. United States*, 318 U.S. 363, 366 (1943). That is why the Congress alone may "define the limits" of federal spending programs, *Rust v. Sullivan*, 500 U.S. 173, 194 (1991), and it is why states cannot impose their own conditions on how federal spending programs operate unless Congress explicitly invites them to do so, *see, e.g.*, *Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 260-70 (1985); *Arizona v. Bowsher*, 935 F.2d 332, 334-36 (D.C. Cir. 1991). The contours of a "relationship [that] originates from, is governed by, and terminates according to federal law" are for the federal government alone to delimit. *Buckman*, 531 U.S. at 347. "[T]he Supremacy Clause does not permit [states] to take over a federal program just because they think they can do it better." *Bowsher*, 935 F.2d at 334.

That is especially true when it comes to spending power programs that operate on consent, as the federal government not only possesses the power to define the limits of such programs, but has an obligation to define those limits clearly. "[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). "The legitimacy of" such laws "thus rests on whether the [recipient]

40

voluntarily and knowingly accepts the terms of the 'contract.'" *Id.* Because "[t]here can, of course, be no knowing acceptance if a [party] is unaware of the conditions or is unable to ascertain what is expected of it, … if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.* So if Congress wants to subject participants in federal spending power programs to special state-law obligations or enforcement actions, it must make that intention plain.

Maine's law intrudes upon the federal government's uniquely federal interest in defining—clearly—the limits of its spending programs. Chapter 103 is a naked attempt to reconfigure the 340B Program according to the state's liking. By imposing novel conditions of participation in the 340B Program—participation in which is a condition of participation in Medicaid and Medicare—that Congress did not authorize, Maine effectively seeks to hijack that federal program to advance the state's own interests at the cost of frustrating Congress's efforts to design a program in which the benefits and burdens of participation align. By seizing control of the federal spending power, Maine not only has interfered with Congress's judgments about what conditions are appropriate to attach to federal funds, but has frustrated Congress's uniquely federal interest in ensuring both that it can attract participants to its programs and that it abides by its obligation to inform them clearly of those programs' terms. For that reason too, Chapter 103 violates the Supremacy Clause.

**B.     The 340B Statute Preempts Chapter 103.**

The Supremacy Clause principles just discussed suffice to establish that PhRMA is likely to succeed on the merits.  But Chapter 103 also violates the Supremacy Clause because it is preempted by the 340B statute.

**1.     Chapter 103 is field preempted.**

State law is preempted by a federal statute when it intrudes on an exclusively federal field.  *Arizona v. United States*, 567 U.S. 387, 399 (2012).  As explained, the 340B Program "originates from, is governed by, and terminates according to federal law," *Buckman*, 531 U.S. at 347, and Congress did not give states any role in administering or enforcing it.  On the contrary, the 340B statute comprehensively defines (1) which entities are eligible for 340B prices, 42 U.S.C. §256b(a)(4); (2) which prescriptions are eligible for 340B prices, *id.* §256b(a)(5); and (3) under what circumstances manufacturers must offer to sell their drugs at 340B prices, *id.* §256b(a)(1).  *See Novartis*, 102 F.4th at 460-64.  It also squarely addresses enforcement, establishing a uniform federal scheme overseen by HRSA.  42 U.S.C. §256b(d); *see Astra*, 563 U.S. at 113-20.  By unabashedly injecting Maine into a federal program that Congress gave states no power to regulate, administer, or enforce, Chapter 103 unlawfully intrudes into an exclusively federal field.

The district court rejected field preemption only by adopting an untenable construction of Maine's law.  According to the district court, Chapter 103 addresses

the "'distribution of drugs to patients and the role of pharmacies in such distribution,' which is a subject that does not fall within a specific field that Congress manifested an intent [to] occupy exclusively." Add.19a. That is simply wrong. The conditions Chapter 103 outlaws are not conditions on how or to whom drugs will be distributed. They are conditions on when they will be *sold at 340B prices*. As PhRMA's declarations explain, manufacturers wish to refuse to *sell* their drugs to a covered entity *at 340B prices* unless the entity agrees to abide by their contract-pharmacy and claims-data conditions. *See, e.g.*, Appx.81-82, 88-89. To be clear, manufacturers will still sell their drugs to covered entities that will not agree to those conditions—just not necessarily at 340B prices. *See, e.g.*, Appx.82, 89. And, as explained, two circuits have held that manufacturers are free under federal law to impose those conditions on their offers to *sell* their drugs *at 340B prices*.

That is precisely why Maine enacted Chapter 103 following the decisions in the Third and D.C. Circuits: It wants to compel the *sale* of drugs *at 340B prices* when federal law does not. Indeed, if Chapter 103 were truly limited to regulating "distribution"—and truly left manufacturers free to refuse to *sell* drugs *at 340B prices* to covered entities that will not agree to their contract-pharmacy and claims-data conditions—then it would accomplish nothing. In reality, Chapter 103 forces manufacturers to *sell* their drugs to covered entities *at 340B prices*. That is a

regulation of the price manufactures may charge for their drugs—which even the district court admitted would be preempted by the federal 340B statute.[3]

### 2. Chapter 103 is conflict preempted.

Chapter 103 is also conflict preempted.  State law is preempted when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990).  Courts determine whether state law does so by "examining the federal statute as a whole and identifying its purpose and intended effects" to see whether the state regulation frustrates operation of the federal law.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).  Here, conflicts with federal law abound.

a.    First, Chapter 103 eliminates the "discretion" that the 340B statute grants manufacturers to impose reasonable conditions on their offers to sell 340B-priced drugs to covered entities.  *Sanofi*, 58 F.4th at 705.  Indeed, that is its whole point:  Maine wants to make manufacturers sell drugs to covered entities at 340B

---

[3] The district court also invoked the "reasoning of other courts on the field preemption issue" to bolster its conclusion.  Add.20a.  But each of those decisions likewise rested on the flawed premise that the relevant state laws address only "the distribution of drugs to patients" and "the role of pharmacies in this distribution." *AbbVie, Inc. v. Murrill*, 2026 WL 350685, at *5 (5th Cir. Feb. 9, 2026); *see also PhRMA v. McClain*, 95 F.4th 1136, 1145 (8th Cir. 2024); *AbbVie Inc. v. Fitch*, 2024 WL 3503965, at *9-13 (S.D. Miss. July 22, 2024).  As other courts have correctly recognized, the state laws at issue in these cases actually compel *sales at 340B prices* where federal law does not.  *See, e.g.*, *Drummond*, 2025 WL 3048929; *PhRMA v. Morrisey*, 760 F.Supp.3d 439 (S.D. W. Va. 2024).

prices even when federal law does not require them to do so. By doing so, Chapter 103 both imposes obligations "not contemplated by Congress," *Sperry v. Florida ex rel. Fla. Bar*, 373 U.S. 379, 385 (1963), and creates a situation in which the "Federal Statute authorizes" participating manufacturers "to engage in activities that the State Statute expressly forbids," *Barnett Bank v. Nelson*, 517 U.S. 25, 31 (1996). Maine's law thus directly "interferes with the methods by which the federal statute was designed to" achieve its purposes. *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987).

The 340B statute directs the HHS Secretary to "enter into an agreement with each manufacturer" that "shall require that the manufacturer offer each covered entity covered outpatient drugs for purchase" at or below a ceiling "price." 42 U.S.C. §256b(a)(1). To ensure that manufacturers would participate in the Program, Congress "preserve[d] … the ability of sellers to impose" some conditions on their offers to sell drugs to covered entities as 340B prices. *Novartis*, 102 F.4th at 460. To be sure, Congress did not spell that out explicitly; the statutory *text* is "silent" about what conditions manufacturers may impose on their 340B offers. *Novartis*, 102 F.4th at 460. But that does not mean that the statute has nothing to say about that question—as evidenced by the holdings in both *Novartis* and *Sanofi* that, while some conditions are compatible with the 340B statute, other, *un*reasonable conditions might be statutorily foreclosed. *See id.* at 464; *Sanofi*, 58 F.4th at 706.

As those decisions recognize, textual silence is not always the end of the interpretive inquiry, as even silence must be read against canons of construction and statutory structure. And both confirm that Congress's silence here reflects not agnosticism, but rather a "knowing choice" to leave manufacturers with "freedom and flexibility" to impose reasonable contract-pharmacy and claims-data conditions on their 340B offers. *Lawrence*, 469 U.S. at 263-64.

That is especially true given the spending-power context in which the 340B statute operates. Of course, when it comes to "ordinary legislation," *Cummings*, 596 U.S. at 219, silence about the role of states typically "*defeats* a claim of preemption." *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. Dep't of Health*, 699 F.3d 962, 985 (7th Cir. 2012). But that is decidedly *not* the case when it comes to spending power legislation, as conditions of participation in such programs must be clearly defined. *See Pennhurst*, 451 U.S. at 17-18. To be sure, participants in federal spending programs understand that they still must comply with *generally applicable* state laws (unless Congress expressly or impliedly preempts them); accepting federal funds is not a get-out-of-state-law-free card. *See Johnson*, 254 U.S. at 56-57. But if Congress wants to empower states to be able to step into the spending program itself and impose their own conditions on participation in it, then Congress needs to affirmatively say so; it cannot leave participants at risk of being ambushed with obligations to which they did not consent.

Just as Congress did not expressly empower HRSA to restrict manufacturers' discretion to impose reasonable conditions on their 340B offers, it did not expressly empower states to do so either. Maine does not claim otherwise. That forecloses any claim that Congress empowered states to impose their own restrictions on what conditions program participants may include in their offers to sell drugs to covered entities at 340B prices.

The district court's contrary conclusion rests on a basic misunderstanding of both Chapter 103 and the 340B statute. The court found no conflict between state and federal law because it "discern[ed] nothing in 340B to suggest that Congress intended to limit the number of patients for whom covered entities may prescribe drugs at the discounted rate" or "to suggest that Congress intended for manufacturers to have an unfettered right to adopt policies with the purpose of limiting the number of its patients for whom a covered entity may prescribe drugs at the discounted rate." Add.30a. That is doubly wrong. For one thing, the 340B program has nothing to do with the price that *patients* pay. Covered entities are free to charge their patients the full price for the drugs that they purchase at 340B prices, and both they and their contract pharmacies routinely do. *See* pp.10-13, *supra*. Moreover, the contract-pharmacy conditions Chapter 103 forbids do not restrict the number of patients able to access the medicines they need. *See* William Sarraille et al., IQVIA, *Do 340B Contract Pharmacies Really "Increase Access" for 340B Patients?* 1, 8 (2025),

https://perma.cc/JW35-4CJ4; Appx.82, 89.  Nor do they preclude covered entities from passing on those reduced prices to as many patients as they choose.  Covered entities just have to agree to sell those reduced-price drugs to their patients directly, or through a single contract pharmacy, rather than through a potentially unlimited number of contract pharmacies all over the country.  *See* Appx.82.

As for the district court's invocation of the presumption against preemption, that presumption "is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000).  And until a few years ago when bills like Chapter 103 started storming the stage, the 340B Program was an exclusively federal one.  Moreover, Maine's law is neither longstanding nor generally applicable, as it applies *only* to manufacturers that participate in the federal 340B Program.  *Cf. Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 534 (2009).  This case is thus the poster child for *rejecting* any presumption against preemption.  The court's invocation of "congressional silence" is equally unavailing.  In the context of a federal spending program, silence means that states *cannot* impose conditions that Congress did not, as to do so would violate the rule that conditions of participation in such programs must be clearly defined.  *See* pp.44-46, *supra*.

b.      In addition to impermissibly expanding the obligation to sell drugs at 340B prices, Chapter 103's prohibition on requiring covered entities to furnish data

about the claims they maintain are eligible for 340B pricing also conflicts with the 340B statute because it frustrates manufacturers' ability to access the ADR regime that Congress designed as a bulwark against fraud and abuse. Under federal law, manufacturers cannot participate in ADR unless they first audit a covered entity. 42 U.S.C. §256b(d)(3)(B)(iv). To conduct an audit, however, manufacturers must provide "documentation" to HRSA establishing "reasonable cause" to believe that a covered entity is violating the prohibitions on diversion or duplicate discounting. That is no easy task even without laws like Chapter 103, as HRSA requires manufacturers to produce a detailed audit plan that "set[s] forth a clear description of why [the manufacturer] has reasonable cause" and identifies "sufficient facts and evidence in support of the belief." 61 Fed. Reg. at 65,410. But Chapter 103's prohibition on claims-data conditions would be the final nail in ADR's coffin.

To audit for "duplicate discounts," a manufacturer must have enough information about what prescriptions are at issue to provide HRSA with "reasonable cause" to suspect statutory noncompliance. *Id.* at 65,409-10; *Eli Lilly & Co. v. Kennedy*, 2025 WL 1423630, at *13 (D.D.C. May 15, 2025). So too with "diversion"—a manufacturer must know what prescriptions the covered entity believes qualify for 340B pricing to determine whether the entity is correct. Manufacturers' policies requiring provision of that data are in line with widespread "business practices" and cover only "standard information" readily available to

covered entities. *Novartis*, 102 F.4th at 463. By prohibiting manufacturers from requiring covered entities to provide such data if they want to purchase drugs at 340B prices, *see* 24-A M.R.S.A. §7753(2), Chapter 103 prevents manufacturers from securing the "documentation" that is essential to initiate an audit, thus vitiating their ability to access ADR.

That is not just a problem for the 340B Program. Under the Inflation Reduction Act ("IRA") Medicare Drug Price Negotiation Program, HHS must "negotiate" with manufacturers "maximum fair price[s]" for certain drugs. 42 U.S.C. §1320f-3(a). Manufacturers must provide access to selected drugs at so-called maximum fair prices, except when the drug is eligible for 340B pricing, and the 340B price is lower. *Id.* §1320f-2(d). Avoiding duplicate price reductions requires manufacturers to identify when a drug is acquired at the 340B price—which requires claims data. *See* Ctrs. for Medicare & Medicaid Servs., *Medicare Drug Pricing Negotiation Final Guidance* 57-58, 60 (Oct. 2, 2024), https://perma.cc/Q8KB-LLYE. By prohibiting manufacturers from requiring covered entities to furnish that very data, Chapter 103 makes it all but impossible to avoid duplicate discounts, driving up the costs of participating in the 340B Program higher still. On top of all that, Chapter 103 drives up HRSA's costs beyond what Congress contemplated, as it precludes manufacturers from identifying potential for

50

fraud and abuse themselves—all while forcing manufacturers to sell their drugs at 340B prices in circumstances when federal law does not.

The district court's sole explanation for rejecting preemption as to the bar on claims-data conditions was to observe that "neither Plaintiff nor the manufacturers have demonstrated that claims data are necessary to obtain an audit or that the proof necessary to obtain an audit is particularly onerous." Add.33a-34a.[4] But manufacturers have virtually no other way of providing the "reasonable cause" that is necessary to obtain an audit except for the claims data that Maine has now removed from the manufacturers' reach. *See, e.g.*, *Morrisey*, 760 F.Supp.3d at 450-53. Chapter 103's bar on claims-data conditions frustrates accomplishment of Congress's objectives thrice over.

c.      Chapter 103 also conflicts with the 340B Program's exclusive federal administrative and enforcement regime. *Astra*, 563 U.S. at 113. The Supreme Court

---

[4] Below, the parties disputed whether Chapter 103 is preempted because it prevents manufacturers from obtaining claims data as part of participation in the Rebate Model Pilot Program. That program was preliminarily enjoined in *American Hospital Association v. Kennedy*, No. 2:25-cv-600 (D. Me. Dec. 29, 2025), Dkt.90. On February 5, 2026, the federal government and the plaintiff there jointly moved to: vacate the approvals of 340B rebate program applications; remand to the agency; and close the case. *See* Joint Mot. for Vacatur and Remand, *id.*, Dkt.114. On February 13, HRSA filed a Request for Information seeking input on whether to implement a rebate model pilot program. *See* HRSA, *Request for Information: 340B Rebate Model Pilot Program*, https://perma.cc/K762-V3F3. While, at this time, the pilot program no longer provides a basis for enjoining Chapter 103, PhRMA reserves the right to reassert preemption should HRSA implement a renewed version.

concluded in *Astra* that Congress designed the 340B Program to operate as a single, nationally uniform program with a sole federal agency decisionmaker and enforcer. *Id.* at 121-22. There, the Court held that covered entities cannot sue manufacturers on a breach-of-contract theory for violating their 340B obligations. *See id.* at 118. As the Court explained, "[f]ar from assisting HHS, suits by [covered] entities would undermine the agency's efforts to administer both Medicaid and §340B harmoniously and on a uniform, nationwide basis." *Id.* at 120-22. "With HHS unable to hold the control rein, the risk of conflicting adjudications would be substantial." *Id.* Like the contract claims in *Astra*, Chapter 103 appropriates HRSA's exclusive authority to administer the 340B Program on a uniform, nationwide basis, as it empowers state actors to make decisions about how the program should operate without any involvement from HRSA.

The district court did not dispute that conflicting adjudications would raise conflict-preemption concerns, but it nonetheless concluded that "the potential for conflicting adjudications" is "too speculative" at this stage "to support a finding that Plaintiff is likely to prevail." Add.32a. That blinks reality. PhRMA is a trade organization that represents various drug manufacturers—the same manufacturers that would be subject to enforcement actions under Chapter 103. Those manufacturers have attested that they would almost certainly assert federal defenses in any enforcement action under Chapter 103, and that those defenses will inevitably

involve federal questions, including whether: (1) the drugs for which 340B pricing is sought are going to patients of covered entities, *Eli Lilly*, 2025 WL 1423630, at *2; (2) the covered entity and/or contract pharmacy is engaged in duplicate discounting, 42 U.S.C. §256b(a)(5)(A); (3) the contract pharmacy that dispenses the 340B-priced drugs could lawfully receive them, *id.* §256b(a)(5)(B); and (4) any violations under federal law disqualify the covered entity from participating in the 340B Program, *Astra*, 563 U.S. at 120.

HRSA has authority to address all those issues. *See* 42 C.F.R. §10.21(a)(1). Yet Maine seeks to address the same disputes at the behest of its Attorney General and Superintendent, while leaving HRSA entirely out of the equation. Just like the contract claims contemplated in *Astra*, that would destroy the unified control over 340B that Congress established, and risk creating the conflicting determinations by state and federal actors that Congress sought to avoid. It is no answer that PhRMA has not quantified precisely "how often" conflicting adjudications might arise. *Contra* Add.32a. PhRMA has demonstrated that they are likely to do so. That suffices to show that Chapter 103 stands in irreconcilable conflict with the 340B statute in this regard as well.

## C.    The Remaining Factors Favor Injunctive Relief.

The other injunctive relief factors—irreparable harm, balance of the equities, and the public interest—favor preliminarily enjoining Chapter 103.

Without preliminary relief, PhRMA's members will continue to be forced to comply with an unconstitutional state law or risk hefty civil penalties. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). And they are incurring compliance costs and lost resources by being forced to honor price concessions not required by federal law. Appx.75-76, 82-84, 89-91. Those financial injuries are irreparable because it would be practically impossible for manufacturers to claw back price reductions from covered entities, *cf. Lee v. Bickell*, 292 U.S. 415, 421 (1934), and because Maine's sovereign immunity bars them from recovering a money judgment against the state in these circumstances. And the irreparable injury does not stop there, as the time and money PhRMA's members have had to expend to comply with both Chapter 103 and the 340B Program is diverting valuable resources away from investment in research and development and other priorities. *See, e.g.*, Appx.79-80, 84; *see also New York v. Trump*, 133 F.4th 51, 73 (1st Cir. 2025) ("disruptions to research projects" qualify as irreparable harm).

The balance of harms and public interest also favor preliminary relief. Because "enforcement of an unconstitutional law is always contrary to the public interest," *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013), Maine has no valid interest in enforcing Chapter 103. And preliminary relief would preserve the status quo of exclusive federal control over the 340B Program, which is what the Supreme Court has already concluded Congress sought. *CMM Cable Rep., Inc. v. Ocean*

*Coast Props., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995).  The state's intrusion upon this exclusively federal program upends that status quo, and seizes from the federal government control that is not for the states to exercise.

## CONCLUSION

This Court should reverse.

Respectfully submitted,

s/Erin E. Murphy
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
PHILIP HAMMERSLEY[*]
CAMILO GARCIA[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

[*] Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Plaintiff-Appellant*

March 2, 2026

# CERTIFICATE OF COMPLIANCE
## WITH RULE 32(a)

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,985 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Times New Roman size 14-point font with Microsoft 2016.

Date: March 2, 2026

s/Erin E. Murphy
Erin E. Murphy

# CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy

# ADDENDUM

# TABLE OF CONTENTS

Order Denying Motion for Preliminary Injunction (Jan. 23, 2026), Dkt.51 ..........................................................................1a

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

PHARMACEUTICAL RESEARCH          )
AND MANUFACTURERS                )
OF AMERICA,                      )
                                 )
          Plaintiff              )
                                 )
     v.                          )     1:25-cv-00469-JCN
                                 )
AARON FREY, et al.,              )
                                 )
          Defendants             )

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff, a trade association representing biopharmaceutical research companies, challenges a Maine statute related to the role of contract pharmacies within a federal drug discount program.  (Complaint, ECF No. 1.)  Plaintiff contends that the Maine statute violates the Supremacy Clause and constitutes an extraterritorial regulation.  The matter is before the Court on Plaintiff's motion for a preliminary injunction.  (Motion, ECF No. 14.) Defendants oppose the motion.[1]  (Response, ECF No. 22.)

After consideration of the parties' oral and written arguments, and following a review of the record, the Court denies the motion.

---

[1] Plaintiff named Aaron Frey, Maine's Attorney General, and Bob Carey, the Superintendent of the Maine Bureau of Insurance, as defendants.

**1a**

FACTUAL AND PROCEDURAL BACKGROUND[2]

A.    The 340B Statute

In 1992, Congress created a drug discount program referred to as the 340B program. 42 U.S.C. § 256b.  All drug manufacturers who want their drugs to be covered under Medicaid and Medicare Part B must enter into an agreement with the Secretary of Health and Human Services (the Secretary or HHS) to comply with 340B program requirements, including that drug manufacturers must sell covered outpatient drugs to covered entities at or below a ceiling price.  *Id.* § 256b(a)(1).  Among other provisions, the statute establishes a formula for calculating ceiling prices, *id.* § 256b(a)(2), defines covered drugs, *id.* § 256b(a)(3), (b)(2), and lists the types of healthcare facilities qualifying as covered entities, *id.* § 256(a)(4).  The discounts in the program are significant, "typically knocking 20–50% off the drug's sticker price."  *Amgen, Inc. v. Kennedy*, No. CV 24-3571 (JEB), 2025 WL 2206948, at *1 (D. D.C. Aug. 4, 2025).

Covered entities are types of facilities that generally provide care to underserved communities.  *See Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113 (2011).  "The discounts help uninsured patients, who can get cheaper drugs from covered entities.  They also help covered entities themselves.  The entities can buy drugs at a discount, get reimbursed by insurers for the drug's full price, and pocket the difference."  *Amgen*, 2025

---

[2] The following facts are derived primarily from public documents amenable to judicial notice and the declarations filed in connection with Plaintiff's motion.  The Court also reiterates herein some of the background summary and legal analysis included in its decision in two related cases in which two manufacturers asserted similar claims in their challenges to the same Maine statute.  *See Novartis Pharms. Corp. v. Frey*, No. 1:25-cv-00407-JCN, 2025 WL 2813787 (D. Me. Sept. 23, 2025).

WL 2206948, at *1 (citations omitted).[3]  Covered entities are prohibited from requesting the 340B discount for drugs that also qualify for a Medicaid rebate (referred to as a double discount), 42 U.S.C. § 256b(a)(5)(A), may not resell or otherwise transfer the discounted drugs to anyone who is not a patient of the covered entity (referred to as diversion), *id.* § 256b(a)(5)(B), and must allow the Secretary and manufacturers to audit their records according to procedures established by the Secretary, *id.* § 256b(a)(5)(C).

If the Secretary finds that a covered entity has engaged in double-discounting or diversion, the entity shall be liable to the manufacturer for the discounts it received improperly.  *Id.* § 256b(a)(5)(D).  In appropriate cases, the Secretary may also impose sanctions on a covered entity, which sanctions could include interest penalties, disqualification of the entity for a period, and/or reference of the matter to other federal authorities.  *Id.* § 256b(d)(2)(B)(v).  The Secretary can also impose monetary sanctions on manufacturers for charging more than the ceiling price.  *Id.* § 256b(d)(1)(B)(vi).

The 340B program "is superintended by the Health Resources and Services Administration (HRSA)," a sub-agency within HHS.  *Astra*, 563 U.S. at 113.  Several courts, however, have noted that Congress did not grant HHS broad authority to issue

---

[3] There may be some dispute about the extent to which insured patients benefit from the discount or whether the entire discount is retained by covered entities and others, like third-party administrators, who coordinate with covered entities.  An insured patient may not benefit directly from the lower price if their out-of-pocket cost is the same, regardless of whether the drug is eligible for the discount, but uninsured patients arguably benefit directly and both uninsured and insured patients arguably benefit indirectly because one purpose of allowing the covered entity to retain the amount of the discount is that they are able to use the extra funds in service of their patients.  *See American Hospital Association v. HHS*, No. 4:20-CV-08806-YGR, 2021 WL 616323, at *1 (N.D. Cal. Feb. 17, 2021) ("covered entities . . . use the discounts to stretch scarce federal resources and serve a greater number of uninsured and under-insured patients").  In any event, the potential dispute is not central to Plaintiff's request for a preliminary injunction.

regulations. *See, e.g., American Hospital Association v. HHS*, No. 4:20-CV-08806-YGR, 2021 WL 616323, at *7 (N.D. Cal. Feb. 17, 2021). Rather, rulemaking authority is currently limited to "(1) the establishment of an administrative dispute resolution process [ADR];" (2) drug-pricing methodology; and (3) imposition of monetary sanctions for violations. *Pharmaceutical Research & Manufacturers of America v. HHS*, 43 F. Supp. 3d 28, 41 (D. D.C. 2014).

**B.      The Role of Contract Pharmacies**

In December 1993, HRSA proposed a guidance notice regarding the 340B program which, as relevant here, specified that a covered entity may enter into a written agreement with a purchasing agent to negotiate contracts or receive drug shipments for distribution to the entity. 58 Fed. Reg. 68922, 68924. In May 1994, HRSA issued a similar final guidance notice. 59 Fed. Reg. 25110, 25113. In response to comments requesting that manufacturers not be required to sell to intermediaries, HRSA advised that covered entities often use purchasing agents or contract pharmacies, and that by limiting those sales transactions, manufacturers could be discouraging covered entities from participating in the program. *Id.* at 25111.

In November 1995, HRSA proposed a guidance notice regarding the 340B program and contract pharmacy services. 60 Fed. Reg. 55586. In August 1996, HRSA issued a substantially similar final guidance notice. 61 Fed. Reg. 43549. The notices encouraged covered entities to sign a contract pharmacy service agreement with a contractor based on model agreement terms to facilitate participation in the 340B program by covered entities that lacked access to in-house pharmacy services. *Id.* at 43555. The model agreement

terms included a limit for one contractor site and a procedure where the covered entity would purchase the drug, the manufacturer would bill the covered entity, but the drug would be shipped directly to a contract pharmacy.  *Id.*  Other terms in the model agreement included a commitment not to divert drugs to individuals who are not patients of a covered entity and to be subject to audits.  *Id.*

In 2001, HRSA established Alternate Methods Demonstration Projects, which, among other things, allowed some covered entities to apply and be approved to use a contract pharmacy to supplement an in-house pharmacy and to use multiple contract pharmacy service sites instead of a single site.  72 Fed. Reg. 1540.  In January 2007, HRSA proposed new guidance that would permit all covered entities to use multiple contract pharmacy sites and to use contract pharmacies to supplement an in-house pharmacy.  *Id.* at 1541.  In March 2010, HRSA issued final guidelines stating that covered entities are not limited to providing in-house or contract pharmacy services at one location.  75 Fed. Reg. 10272, 10277.  In the same month, as part of the Patient Protection and Affordable Care Act, Pub. L. 111–148, 124 Stat. 119 (2010), Congress expanded the 340B program, which expansion provided that "covered entities" would also include hospitals serving isolated rural areas and added some of the enforcement provisions found in the current version of the statute.  *Id.* §§ 7101-7102.

Since 2010, the 340B program has grown significantly.  Plaintiff and drug manufacturers attribute much of the growth to the unlimited use of contract pharmacies and suggest that some of the growth is a result of improper discount claims.  Covered entities and pharmacies have also shifted away from segregated inventories for 340B drugs

and other drugs and toward retroactive methods of claiming and tracking 340B discounts, including a method known as the replenishment model.  Plaintiff contends that the use of multiple contract pharmacies and retroactive accounting methods makes it more difficult to detect diversion and double discounting and increases the risk that diversion, double discounting, and wrongful discount requests will occur.

The replenishment model works as follows: (1) the pharmacy purchases a quantity of a drug at market price and maintains it in common inventory; (2) the pharmacy dispenses drugs from the common inventory whenever a customer arrives with a prescription without regard to whether the customer is a patient of a covered entity; (3) an administrator later reviews claims data to analyze which transactions were for covered drugs to a patient of a covered entity and thus eligible for a 340B discount; and (4) after enough qualifying transactions have occurred, the covered entity orders more units of the drug at the discounted price to replenish the units dispensed to patients of the covered entity.

## C.    HRSA Prohibition of Manufacturer Limits

In 2020, some manufacturers began to limit both the number of pharmacies to which they would deliver drugs and the maximum distance between the covered entity and the pharmacy site.  Some manufacturers also required covered entities to provide claims data to be eligible to use contract pharmacies.  In December 2020, the HHS Office of the General Counsel issued an advisory opinion stating that the statute unambiguously obligated manufacturers to deliver drugs to contract pharmacies because the statute only required that drugs be purchased by a covered entity and set no other requirements for eligibility.  Several manufacturers filed suit challenging the opinion.  One district court

struck down the advisory opinion under the Administrative Procedure Act, and the Office of the General Counsel withdrew the advisory opinion in June 2021. *See AstraZeneca Pharmaceuticals LP v. Becerra*, 543 F. Supp. 3d 47 (D. Del. 2021); *see also*, *Eli Lilly & Co. v. HHS*, No. 1:21-CV-00081-SEB-MJD, 2021 WL 5039566, at *9 (S.D. Ind. Oct. 29, 2021).

In the meantime, HRSA sent letters to manufacturers in May 2021 notifying them that by placing contract pharmacy and claims data limitations on covered entities, the manufacturers were in violation of the 340B program. HRSA ordered the manufacturers to sell discounted drugs to covered entities without contractual conditions, including by delivering the drugs to the pharmacies with which the covered entities contracted. The manufacturers filed suit in several courts to challenge the alleged violations.

Most of the district courts to consider the legality of the violation letters vacated the letters, and two circuit courts ruled in favor of the manufacturers. In *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023), the Third Circuit reasoned that because HRSA had not been granted broad rulemaking authority, because the statute did not mention contract pharmacies or delivery locations, and because the statute "imposes only a price term for drug sales to covered entities, leaving all other terms blank," *id.* at 703-04, HRSA could not establish that the manufacturers violated 340B by imposing conditions on requests for delivery to contract pharmacies, which meant "the Violation Letters and Advisory Opinion are unlawful." *Id.* at 706. In *Novartis Pharmaceuticals Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024), the D.C. Circuit determined that the district court properly set aside the violation letters, *id.* at 373, because the statute merely requires that a

7

**7a**

manufacturer offer to sell drugs "at or below a specified monetary amount" and because

the statute is "silent about delivery conditions," and "statutory silence implies that private

parties may act freely." *Id.* at 369. The court noted that a manufacturer would likely violate

the statute by imposing terms that are "unreasonable" or "onerous enough" to effectively

increase the price above the statutory ceiling or fall short of a "bona fide offer," but the

manufacturers' conditions in that case were not so burdensome as to violate the statute on

its face. *Id.* at 371–73.

## D.    State Statutes Prohibiting Manufacturer Limits

In June 2025, Maine enacted a statute entitled the "Protect Health Care for Rural

and Underserved Communities Act," which statute went into effect in September 2025.

2025 Me. Legis. Serv. Ch. 388 (H.P. 132) (L.D. 210) Sec. P-5 (West). The statute created

a new "Chapter 103" within the Maine Insurance Code, and includes the following

provision:

> **Prohibition of certain discriminatory actions by manufacturer or agent related to 340B entities**
>
> **1. Interference with acquisition or delivery of 340B drugs prohibited.** A manufacturer or its agent may not deny, restrict, prohibit or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B contract pharmacy on behalf of a 340B entity unless receipt of that 340B drug is prohibited by the United States Department of Health and Human Services.
>
> **2. Submission of claims or utilization data prohibited.** A manufacturer or its agent may not, either directly or indirectly, require a 340B entity to submit any claims or utilization data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity

8

**8a**

unless the claims or utilization data sharing is required by the United States Department of Health and Human Services.

**3. Other interference prohibited.** A manufacturer may not otherwise interfere directly or indirectly with a 340B entity unless expressly authorized by the United States Department of Health and Human Services.

24-A M.R.S.A. § 7753.

The statute defines a "340B entity" as "an entity participating or authorized to participate in the federal 340B drug discount program, as described in 42 United States Code, Section 256b, including its pharmacy, or any pharmacy contracted with the participating entity to dispense drugs purchased through the federal 340B drug discount program." 24-A M.R.S.A. § 7752(7). A "340B drug" is defined as "a drug that is purchased or eligible for purchase under Section 340B of the federal Public Health Service Act, 42 United States Code, Section 256b(a)(3)." 24-A M.R.S.A. § 7752(6). A "340B contract pharmacy" is defined as "a pharmacy that has a contract with a 340B entity to receive and dispense 340B drugs to the 340B entity's patients on behalf of the 340B entity." 24-A M.R.S.A. § 7752(5).

Each violation of Chapter 103 is "subject to enforcement under the Maine Unfair Trade Practices Act[.]" 24-A M.R.S.A. §7757(1). The Maine Unfair Trade Practices Act permits the Attorney General to "bring an action in the name of the State," to seek an injunction and restitution for any person who has suffered an ascertainable loss, and the Act provides that a person who violates an injunction imposed under the Act can incur a civil penalty up to $10,000 per violation. 5 M.R.S.A. § 209.

Approximately twenty states, including Maine, have enacted laws in response to the court decisions finding that HRSA lacked statutory authority to prohibit the manufacturers' policies. While differences exist among the state statutes, they share certain features, including prohibitions on certain manufacturer limits on covered entities and contract pharmacies, as well as alternative remedies for violations of the prohibitions. Drug manufacturers filed lawsuits challenging the state statutes and seeking injunctive relief. At least nine district courts (including this Court), either on a motion for preliminary injunction or a motion for summary judgment, have declined to enjoin the enforcement of the relevant state statute after considering similar legal claims to those Plaintiff asserts here; on appeal, the Eighth Circuit and Fifth Circuit upheld two of those decisions.[4] Other appeals are pending. At least three district courts have denied a motion to dismiss or

---

[4] *See Pharmaceutical Research & Manufacturers of America v. McClain,* 645 F. Supp. 3d 890 (E.D. Ark. 2022) (denying plaintiff's motion for summary judgment on preemption); *Pharmaceutical Research & Manufacturers of America v. McClain,* 95 F.4th 1136 (8th Cir. 2024) (affirming conclusion that Arkansas statute is not preempted), cert. denied, 145 S. Ct. 768 (2024); *Novartis Pharmaceuticals Corp. v. Fitch*, 738 F. Supp. 3d 737 (S.D. Miss. 2024) (denying plaintiff's motion for preliminary injunction); *AbbVie Inc. v. Fitch*, No. 1:24-CV-184-HSO-BWR, 2024 WL 3503965 (S.D. Miss. July 22, 2024) (same); *AbbVie, Inc. v. Fitch*, 152 F.4th 635 (5th Cir. 2025) (affirming denial of preliminary injunction); *Murrill*, No. 6:23-CV-00997, 2024 WL 4361597 (denying plaintiffs' motions for summary judgment); *Astrazeneca Pharmaceuticals LP v. Bailey*, No. 2:24-CV-04143-MDH, 2025 WL 644285 (W.D. Mo. Feb. 27, 2025) (granting in part defendant's motion to dismiss plaintiff's complaint); *AbbVie Inc. v. Skrmetti*, No. 3:25-CV-00519, 2025 WL 1805271 (M.D. Tenn. June 30, 2025) (denying plaintiffs' motion for preliminary injunction); *Novartis Pharmaceuticals Corp. v. Frey*, No. 1:25-cv-00407-JCN, 2025 WL 2813787 (D. Me. Sept. 23, 2025) (denying plaintiffs' motions for preliminary injunction); *AbbVie, Inc. v. Weiser*, No. 25-CV-1847-WJM-KAS, 2025 WL 3041825 (D. Colo. Oct. 31, 2025) (same); *Astrazeneca Pharmaceuticals v. Weiser*, No. 25-CV-02685-PAB-STV, 2025 WL 3653161 (D. Colo. Dec. 17, 2025) (same); AbbVie v. Hilgers, No. 4:25CV3089, 2025 WL 3688051 (D. Neb. Dec. 19, 2025) (same); *AbbVie, Inc. v. Jackley*, No. 3:25-CV-03006-RAL, 2025 WL 3706066 (D. S.D. Dec. 22, 2025) (same).

preliminarily enjoined enforcement of a state statute, accepting similar arguments to those Plaintiff raises here.[5]  Other comparable cases are pending in other district courts.[6]

### STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008).  A district court must decide whether the party seeking a preliminary injunction has carried the burden of establishing that the balance of four factors weighs in its favor:

> (1) the movant's likelihood of success on the merits, (2) whether and to what extent the movant will suffer irreparable harm in the absence of injunctive relief, (3) the balance of relative hardships, and (4) the effect, if any, that an injunction or the lack of one may have on the public interest.

*Becky's Broncos, LLC v. Town of Nantucket*, 138 F.4th 73, 77 (1st Cir. 2025) (quotation marks omitted).  "[T]he four factors are not entitled to equal weight in the decisional calculus; rather, likelihood of success is the main bearing wall of the four-factor framework."  *Corporate Technologies, Inc. v. Harnett*, 731 F.3d 6, 9–10 (1st Cir. 2013) (quotation marks and modifications omitted).

---

[5] *See AbbVie, Inc. v. Brown*, No. 2:25-CV-00271-RJS-DAO, 2025 WL 3228898(D. Utah Nov. 19, 2025) (denying motion to dismiss plaintiffs' Supremacy Clause and Takings claims); *AbbVie Inc. v. Drummond*, No. CIV-25-1156-PRW, 2025 WL 3048929 (W.D. Okla. Oct. 31, 2025) (granting plaintiffs' motions for preliminary injunction in part and enjoining enforcement of select provisions of state law); *Pharmaceutical Research & Manufacturers of America v. Morrisey*, 760 F. Supp. 3d 439 (S.D.W. Va. 2024) (granting plaintiffs' motions for preliminary injunction).

[6] *See, e.g.*, *AbbVie v. Lopez*, 1:25-cv-00230 (D. Haw.); *AbbVie, Inc. v. Bailey*, 4:24-cv-00996 (E.D. Mo.); *AbbVie, Inc. v. Wrigley*, 1:25-cv-00081 (D. N.D.).

**11a**

**DISCUSSION**

**A.      Likelihood of Success**

In Count I of the complaint, Plaintiff asserts a Supremacy Clause claim.  In Count II of the complaint, Plaintiff alleges an extraterritorial regulation claim pursuant to the Due Process Clause, the Commerce Clause, and other provisions.  Plaintiff's arguments in support of the motion for a preliminary injunction concern only Count I.

Under the Supremacy Clause, the Constitution, treaties, federal statutes, and federal regulations are the "supreme Law of the Land[.]"  U.S. Const. art. VI, cl. 2.  "State law may run afoul of the Supremacy Clause in two distinct ways:" by violating the intergovernmental immunity doctrine or the doctrine of preemption.  *North Dakota v. United States*, 495 U.S. 423, 434-36 (1990).  While Plaintiff ultimately proposes an expansive non-targeting rule distilled from parts of the two separate lines of cases, the Court declines Plaintiff's invitation to so combine and extend the "distinct" doctrines.  *See United States v. California*, 921 F.3d 865, 880 & 884 n.9 (9th Cir. 2019) (deeming the doctrines "distinct" and cautioning against the failure to "accurately distinguish between the doctrines of intergovernmental immunity and obstacle preemption").  As explained below, because neither doctrine applies here, Plaintiff has not established a likelihood of success on its Supremacy Clause claim.

**1.      Intergovernmental Immunity**

A state law offends the modern intergovernmental immunity doctrine "only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals."  *North Dakota v. United States*, 495 U.S. 423, 435 (1990).  A

**12a**

state law within the scope of the doctrine is invalid under the Supremacy Clause, "unless Congress provides clear and unambiguous authorization for such regulation." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988) (quotation marks omitted).

An impermissible direct regulation occurs when a state places a tax "on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned[,]" *United States v. New Mexico*, 455 U.S. 720, 735 (1982), or when a state "places a prohibition on the Federal Government," *Hancock v. Train*, 426 U.S. 167, 180 (1976) (quotation marks and footnote omitted). "[A] state law discriminates against the Federal Government or its contractors if it singles them out for less favorable treatment, or if it regulates them unfavorably on some basis related to their governmental status." *United States v. Washington*, 596 U.S. 832, 839 (2022) (quotation marks, citations, and modifications omitted).

To the extent Plaintiff argues that the Maine statute directly regulates the federal government, the argument lacks merit. On its face, Maine's statute does not place any tax, prohibition, or mandate on the federal government or its functions. This is also not a case where a state statute carefully avoids facial restrictions or mandates on the federal government but still interferes directly because it applies to public or private individuals or entities only when they are carrying out the functions of the federal government that the state seeks to restrict. *Cf. CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 320-21 (3d Cir. 2025) (finding an impermissible direct regulation when a state statute prohibited all contracting services for civil immigration detention).

13

**13a**

Plaintiff's primary argument is that because its members contract with HHS, its members are "contractors" subject to a discriminatory state statute. Whether an individual or entity is protected under the intergovernmental immunity doctrine depends on the nature of the contract or relationship with the federal government. *See Geo Group, Inc. v. Newsom*, 50 F.4th 745, 755 (9th Cir. 2022) (recognizing different degrees of protection under the Supremacy Clause against state laws addressing federal instrumentalities, employees, suppliers, and contract workers). Here, the Pharmaceutical Pricing Agreements between Plaintiff's members and HHS are not ordinary "transactional, bargained-for contracts[,]" *Astra*, 563 U.S. at 113, subject to ordinary contract rules because they "have no negotiable terms" and merely "serve as the means by which drug manufacturers opt into the statutory scheme[,]" *id.* at 118. Drug manufacturers participating in the 340B program agree to provide discounts in the marketplace to certain other private entities; the manufacturers do not agree to perform any function of the federal government or provide any goods or services to the federal government. Plaintiff cites no persuasive authority that would support a finding that the mere participation in a regulatory program or receipt of government incentives confers on the participant a contractor status with the federal government. Plaintiff's members, therefore, do not fall within any of the recognized categories of entities with whom the government "deals" for purposes of intergovernmental immunity, such as employees, contract workers, suppliers, or instrumentalities.

Even if Plaintiff could establish the requisite relationship between the manufacturers' agreements and the performance of federal government functions, Plaintiff

14

**14a**

has not demonstrated that Maine's statute violates the relevant antidiscrimination rule. Courts do not examine any one provision in isolation but instead examine the broader regulatory context, *North Dakota*, 495 U.S. at 435, to determine whether the economic burden of a state's rules are "imposed equally on other similarly situated constituents of the State[,]" *id.* at 438. "The State does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *Washington v. United States*, 460 U.S. 536, 544-45 (1983) (footnote omitted).

Plaintiff has not proposed a relevant or workable set of comparators. To the extent Plaintiff maintains that the set of similarly situated entities is comprised of all drug manufacturers doing business in Maine and participating in the 340B program, there is no discernible discrimination because the state statute does not make any other distinctions among the participants. To the extent Plaintiff contends that the set of similarly situated entities consists of all drug manufacturers, Plaintiff evidently argues that the relevant distinction would be participation or nonparticipation in the 340B program. Plaintiff, however, has not argued or provided evidence that there are any such nonparticipating drug manufacturers doing business in Maine. Even if such evidence were presented, Plaintiff has not established that its additional rules for 340B participants are sufficiently burdensome to support a finding that Maine seeks to improperly favor nonparticipating manufacturers over participating manufacturers. *See Dawson v. Steager*, 586 U.S. 171, 177 (2019) ("Whether a State treats similarly situated state and federal employees differently depends on how the State has defined the favored class."); *McHenry County. v. Raoul*, 44 F.4th 581, 594 (7th Cir. 2022) (concluding that a state statute's impact on federal

15

**15a**

domain "is not enough to establish discrimination" for purposes of the intergovernmental immunity doctrine if a plaintiff "cannot identify any actors similarly situated . . . that receive more favorable treatment" under the state statute); *California*, 921 F.3d at 880–81 (noting that the intergovernmental immunity doctrine is concerned with state rules that burden the federal government and reasoning that a state rule does not "burden" the federal government or those with whom it does business just because the state rule "targets" federal rules).

In sum, the intergovernmental immunity doctrine does not invalidate Maine's statute or Maine's rules for contract pharmacies. The Court declines to extend the doctrine to cover any state law that adds a requirement for participants in a federally regulated market or under a federal program.[7] Because the intergovernmental immunity doctrine does not apply as broadly as Plaintiff contends, Plaintiff's claim to any further degree of

---

[7] The evolution of the doctrine of the doctrine weighs against a broad application of the doctrine. The intergovernmental immunity doctrine developed in the state taxation context, *see McCulloch v. Maryland*, 17 U.S. 316 (1819), and the Supreme Court once applied a broad rule prohibiting "taxes on those who had contractual relationships with the Federal Government or with its instrumentalities whenever the effect of the tax," even an indirect effect, "was or might be to increase the cost to the Federal Government of performing its functions." *United States v. Fresno County*, 429 U.S. 452, 460 (1977). The rationale was that "although a tax was collected from an independent private party, the tax was considered to be 'on' the government because the tax burden might be passed on to it through the contract." *South Carolina v. Baker*, 485 U.S. 505, 518 (1988). The Supreme Court later recognized that the approach was untenable and "repudiated" the broader rule in a series of cases beginning in the 1930s. *Id.* at 520–21 ("The thoroughness with which the Court abandoned the burden theory was demonstrated most emphatically when the Court upheld a state sales tax imposed on a Government contractor even though the financial burden of the tax was entirely passed on, through a cost-plus contract, to the Federal Government"). Plaintiff does not argue that Maine's statute would directly or even indirectly increase costs to the federal government. The lack of any clear or apparent impact on federal government costs underscores the conclusions above, including that 340B participants do not qualify as contractors for the federal government and that Maine's contract pharmacy rules do not discriminate in the relevant sense against drug manufacturers or the federal government.

protection from the state statute "must be resolved under principles of congressional pre-emption." *North Dakota*, 495 U.S. at 435.

### 2.    Preemption

"Express preemption occurs when congressional intent to preempt state law is made explicit in the language of a federal statute." *Tobin v. Federal Express Corp.*, 775 F.3d 448, 452 (1st Cir. 2014). There are also two types of implied preemption, "field preemption and conflict preemption[.]" *Capron v. Office of Attorney General of Massachusetts*, 944 F.3d 9, 21 (1st Cir. 2019).

A "presumption against preemption" ordinarily applies to implied preemption claims, *id.*, because courts have long assumed that Congress is reluctant to displace the broad police powers of the states, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). The presumption does not apply to express preemption claims, where courts instead "use the usual tools of statutory interpretation, focusing on the plain wording of the [preemption] clause, which necessarily contains the best evidence of Congress's preemptive intent." *Northwestern Selecta, Inc. v. Gonzalez-Beiro*, 145 F.4th 9, 15 (1st Cir. 2025) (quotation marks and modifications omitted). "[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quotation marks and modifications omitted).

### a.    Field Preemption

Field preemption "can be inferred from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on

the same subject." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quotation marks and modifications omitted). "Implied field preemption analysis has two parts: (1) defining the relevant regulatory field; and (2) evaluating the scope of federal regulation in that field." *Hall v. Delta Air Lines, Inc.*, No. 2:16-CV-00417-JAW, 2018 WL 1570788, at *19 (D. Me. Mar. 30, 2018).

Defining the relevant field at the proper level of generality can be challenging. Some level of specificity is required, *see Basiliali v. Allegiant Air, LLC*, No. 2:18-CV-03888-RGK-MRW, 2018 WL 6219951, at *2 (C.D. Cal. Aug. 30, 2018), but defining the field too narrowly "result[s] in an analysis that resembles conventional conflict preemption." *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 705 n.22 (3d Cir. 2016).

Assessing the 340B statute at the highest level of generality, courts and parties have examined proposed fields such as "the practice of pharmacy," *Pharmaceutical Research and Manufacturers of America v. McClain*, 95 F.4th 1136, 1143 (8th Cir. 2024), the "regulation of contract pharmacies," *Pharmaceutical Research & Manufacturers of America v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597, at *6 (W.D. La. Sept. 30, 2024), and (somewhat more specifically) the provision of "discounted drugs for needy patients." *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 646 (5th Cir. 2025). The Maine law would fall within with the broadly defined fields, but as other courts have found, there can be no inference of preemptive intent because there is no dominant federal interest in such broad fields and the scope and extent of the regulations found in the 340B statute cannot reasonably be characterized as comprehensive or pervasive relative to the breadth of the fields.

Assessing the 340B statute at a lower level of generality, some courts and parties have examined proposed fields such as "340B pricing or entity eligibility to access manufacturers' drugs at 340B discounted prices." *AbbVie Inc. v. Skrmetti*, No. 3:25-CV-00519, 2025 WL 1805271, at *12 (M.D. Tenn. June 30, 2025). Consistent with this view, Plaintiff proposes that the relevant field is the key terms of the 340B statute, namely "eligibility for reduced pricing, the content of a drug manufacturer's 340B offer . . . and the administration and enforcement of the statute's requirements." (Motion at 18.) Yet even if the field were defined in this way, there would be no field preemption. As with the broader proposals of the relevant field, because 340B does not dictate many of the terms regarding manufacturers' obligation to offer and provide covered drugs, the language of 340B is insufficient to suggest a congressional intent to preclude all state regulation in the field. *See Sanofi Aventis*, 58 F.4th at 704 (regarding the terms of an offer, the 340B statute "imposes only a price term for drug sales to covered entities, leaving all other terms blank"); *Fitch*, 152 F.4th at 646 ("Congress chose not to regulate distribution to patients, indicating that it did not intend to occupy the entire field in this area. As the Supreme Court has held, matters left unaddressed in an otherwise comprehensive and detailed federal regulatory scheme are presumably left subject to the disposition provided by state law.") (quotation marks omitted).

The state law addresses covered entities' "distribution of drugs to patients and the role of pharmacies in such distribution," which is a subject that does not fall within a specific field that Congress manifested an intent occupy exclusively. *Fitch*, 152 F.4th at 647. The Court is not aware of a case where a court found that field preemption applied to

a similar state statute.[8]  Courts have consistently concluded that similar state laws are not within the more narrowly defined field.  *See e.g., Skrmetti*, 2025 WL 1805271, at *12 ("The primary problem with the plaintiffs' position is that" the state law does not "say[ ] anything about the pricing of 340B drugs" and only "concern[s] the delivery of 340B drugs.").  While the silence in 340B as to delivery or distribution has been interpreted by some courts to permit drug manufacturers to impose "at least some delivery conditions" and not to require manufacturers to deliver to multiple contract pharmacies as a matter of federal law, *see Johnson*, 102 F.4th at 460, that silence has also been viewed by two circuit courts as suggesting that Congress did not intend to preclude state involvement.  *Fitch*, 152 F.4th at 647; *McClain*, 95 F.4th at 1144.[9]

Given 340B's silence regarding the acts and transactions required to accomplish the objectives of the 340B program (e.g., the distribution of prescription medication at a discounted rate to covered entities) and given the sound reasoning of other courts on the field preemption issue presented here, the Court concludes that Plaintiff has not established that it is likely to succeed on its field preemption claim.

---

[8] In the three cases where courts have been persuaded by manufacturer's preemption arguments and either granted a preliminary injunction or denied a motion to dismiss involving a similar state statute, the basis for the determination was a form of conflict preemption. *See Morrisey*, 760 F. Supp. 3d at 458; *Drummond*, No. CIV-25-1156-PRW, 2025 WL 3048929, at *7; *Brown*, No. 2:25-CV-00271-RJS-DAO, 2025 WL 3228898, at *9.

[9] The D.C. Circuit in *Johnson* did not address whether state involvement was permissible.

### b.     *Conflict Preemption*

Conflict preemption occurs "where compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963), or where the state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000).  While Plaintiff contends that "Maine's process seeks to punish drug manufacturers for obeying federal law," (Motion at 20),  Plaintiff does not argue that it is impossible to comply with both the federal and state obligations.  This is not a case where "federal law forbids an action that state law requires," or vice versa. *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472, 486 (2013).

When analyzing whether a state statute presents an obstacle to the objectives of Congress in the enactment of a statute, a court must identify the relevant purposes, goals, or objectives of the federal law and weigh the magnitude of the burden or the degree of the interference resulting from the state law. *See Maine Forest Products Council v. Cormier*, 51 F.4th 1, 8 (1st Cir. 2022) (observing that the Supreme Court has recently questioned "efforts to ascribe unenacted purposes and objectives to a federal statute" because "hidden legislative wishes" can be "difficult to discern" and the task "risks displacing the legislative compromises") (quotation marks omitted) (citing *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) ; *see also Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000) ("What is a sufficient obstacle is a matter of judgment[.]").

The core congressional objective in this case is not difficult to discern.  The 340B program is designed to use two other large federal spending programs to incentivize

21

**21a**

manufacturers to provide a subsidy to healthcare entities caring for underserved patients.[10] *See Novartis Pharmaceuticals Corp. v. Espinosa*, No. 21-CV-1479-DLF, 2021 WL 5161783, at *7 (D.D.C. Nov. 5, 2021) ("The purpose of Section 340B is clear—it provides discounts on drugs to certain kinds of healthcare facilities."). As Defendants argue, at least as an initial matter, there is little or no tension between the effect of the state law and the central objective of 340B. The effect of the state statute is to prevent limits on and preserve flexibility in the methods of distribution for covered entities, which is in harmony with the 340B goal of providing the entities with prescription drugs at the discounted price for the benefit (directly or indirectly) of underserved patients. The harmonious goals of the federal and state are suggestive but not determinative, however. *See International Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987) ("it is not enough to say that the ultimate goal of both federal and state law" is the same because "[a] state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal").

---

[10] Some manufacturers have argued that providing covered entities with discounted drugs is not the sole objective of the program. Congress placed some specific limitations on discount claims—a formula to calculate the amount of the discount, prohibitions on diversion and double discounting, and auditing requirements and penalties for violations. Some manufacturers maintain that the limitations and enforcement provisions demonstrate an intent to limit, to some degree, the number of claims that would be made by covered entities and to prevent covered entities from claiming more discounts than they are entitled to receive. The manufacturers have argued that 340B reflects Congress' intent to achieve an appropriate balance between providing discounted drugs to the covered entities and incentivizing manufacturers to participate in the program. One court's conclusion in support of this view is that the 340B statute has "twin federal purposes" of providing discounts and protecting manufacturers or preventing fraud. *Morrisey*, 760 F. Supp. 3d at 452. Prevention of excess claims and fraud by covered entities is a discernible goal of the 340B statute, but the "twin federal purposes" notion suggests that these objectives are unrelated to each other, or of equal importance. In the crafting of most, if not all, federal legislation establishing a program with eligibility requirements, fraud prevention is a consideration. Ensuring that the program serves only those who are eligible is an ancillary goal of any such program. Protecting manufacturers against duplicate claims and otherwise preventing fraud are subsidiary goals to the objective of the 340B program, which is to subsidize the cost of drugs to underserved populations.

Plaintiff argues there is a sufficient obstacle to warrant preemption here because the state statute applies only to participants in the federal 340B program, which program does not rely on the states to implement. According to Plaintiff, state rules are always preempted if they target a federal program by adding requirements for participants. Plaintiff relies on two Supreme Court cases, *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) and *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), to support its argument.

The *Boyle* case addressed one of the "few areas" involving "uniquely federal interests" that "are so committed. . . to federal control" that state law can be preempted by judge-made "federal common law," *Boyle*, 487 U.S. at 504, when there is "a significant conflict" with "an identifiable federal policy or interest," *id.* at 507 (internal quotation marks omitted). Because the procurement of equipment by the federal government is an area of uniquely federal interest, the Supreme Court held that state tort liability against contractors for design defects in military equipment is preempted "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512.

In *Buckman*, the Supreme Court held that the Federal Food, Drug, and Cosmetic Act preempted state law fraud claims by patients against medical companies for alleged misrepresentations to the Food and Drug Administration while seeking approval for medical devices. *Buckman*, 531 U.S. at 343–44. The *Buckman* Court reasoned that "the federal statutory scheme amply empower[ed] the FDA to punish and deter fraud against the Administration" through investigative tools backed by criminal punishment, injunctive

relief, and civil penalties, and the agency decided whether and how to pursue the available remedies based on a "delicate balance of statutory objectives" that was likely to be disrupted by allowing private parties to bring "fraud-on-the-FDA claims under state tort law." *Id.* at 348–49.

Plaintiff evidently relies on these cases in part because the Supreme Court did not apply the usual presumption against preemption and thus applied a lower threshold for finding preemption than in many other cases. The *Boyle* Court reasoned that in an area of uniquely federal interest, "[t]he conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption when Congress legislates in a field which the States have traditionally occupied." *Boyle*, 487 U.S. at 507 (quotation marks omitted). Similarly, the *Buckman* Court declined to apply the presumption against preemption because "[p]olicing fraud against federal agencies is hardly a field which the States have traditionally occupied," and it cited *Boyle* while noting that "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Buckman*, 531 U.S. at 347 (quotation marks omitted).

The circumstances here are not similar and do not represent a situation where courts have disregarded or should disregard the presumption against preemption. Maine's statute does not regulate the relationship between the federal agency (HHS/HRSA) and the entity it regulates (a drug manufacturer or a covered entity). Maine's statute addresses the relationship between regulated entities and other private entities. There is no dispute that

24

**24a**

states have traditionally had a regulatory role addressing the transactions and relationships among drug companies, medical providers, and pharmacies.

This is also not one of the "few areas" where there are "uniquely federal interests" comparable to the terms of the federal government's procurement contracts or the liability of federal officers for actions taken in the course of their duties. As discussed above, the agreements between drug manufacturers and the Secretary are not analogous to many other contracts, including employment or procurement contacts with the federal government. *See Astra*, 563 U.S. at 113. To the extent Plaintiff argues that there are always "uniquely federal interests" in the legal requirements governing participants in a federal program, that fact alone is insufficient for a court to ignore the presumption against preemption. The argument would expand a limited exception to ordinary preemption principles potentially applicable in only a "few areas," *Boyle*, 487 U.S. at 504, to include many contexts where there is understandable and necessary concurrent federal and state regulation.

Even if the Court were to accept Plaintiff's contention regarding the effect of the federal interests on the presumption against preemption, that would "not . . . end the inquiry," *Boyle*, 487 U.S. at 507, or imply that a state law is always preempted if it targets participants in a federal program. Under *Boyle*, a  state law is only displaced if it causes "a significant conflict" with or would "frustrate specific objectives" of the federal policy. *Id.* (quotation marks omitted). In other words, the most that can be reasonably inferred from *Boyle* and *Buckman* is that for preemption, courts might reasonably require less evidence of preemptive intent or a lesser obstacle to federal purposes when there are stronger federal interests and weaker state interests; the Supreme Court has never adopted

25

**25a**

a categorical rule that requires a finding of preemption whenever a state law is addressed directly to those participating in a federal program. *See id.* at 507–08 ("Or to put the point differently, the fact that the area in question is one of unique federal concern changes what would otherwise be a conflict that cannot produce pre-emption into one that can. But conflict there must be.").

The reasoning of other courts also militates against the broad reading of *Boyle* and *Buckman* that Plaintiff proposes. For instance, courts have found it less tenable to infer that Congress intended to preempt a state statute when the federal statute contemplates a state implementation role within the federal program, while implied preemption is more plausible when a federal statute does not provide any role for states. *See Fresenius Medical Care Holdings, Inc. v. Francois*, 832 F. Supp. 2d 1364, 1368 (N.D. Fla. 2011) (indicating that when a federal statute "has been recognized as a cooperative state-federal program . . . the case for federal preemption is less persuasive and difficult to establish") (quotation marks omitted). Courts also more readily find implied preemption when a state law directly targets a federal program and are less likely to find implied preemption when a general state law impacts a federal program only incidentally. *See Pedraza v. Shell Oil Co.*, 942 F.2d 48, 53–54 & n.5 (1st Cir. 1991) (noting that federal law preempts state laws addressing occupational safety standards but finding no basis for preemption "in the workplace of private rights and remedies traditionally afforded by state laws of general application" or "state criminal laws of general application"); *compare Planned Parenthood of Houston & Southeast Tex. v. Sanchez*, 403 F.3d 324, 341 (5th Cir. 2005) (finding preemption more likely because "[the state] is attempting to impose regulations that restrict the scope of a

26

**26a**

federal program"), *with Deanda v. Becerra*, 96 F.4th 750, 762 n.9 (5th Cir. 2024) (finding preemptive intent less likely because the state law did not target eligibility requirements of a federal program but was instead "a generally applicable state law").

Because there is no categorical rule for state statutes targeting participants in federal programs, a court must still determine in each case whether the alleged obstacles presented by the state law are significant enough to compel preemption. The case of *Pharmaceutical Research & Manufacturers of America v. Walsh*, 538 U.S. 644 (2003) is particularly instructive.

In 2000, the Maine state legislature created the Maine Rx Program, which was intended to authorize anyone in the state to purchase prescription drugs at the lower prices negotiated on behalf of and available to those who purchase drugs through the Medicaid program. *Id.* at 649. Maine used the prospect of imposing prior authorization requirements on nonparticipating manufacturers selling drugs through the Medicaid program to convince drug manufacturers to participate in the state program and provide similar lower prices to the public. *Id.* at 649–50. The district court granted a preliminary injunction in favor of the drug manufacturers, precluding implementation of the program. *Pharmaceutical Research & Manufacturers of America v. Commissioner, Maine DHS*, No. Civ. 00-157-B-H, 2000 WL 34290605, at *6 (D. Me. Oct. 26, 2000). The district court found obstacle preemption because although the federal Medicaid statute allowed states to impose restrictions on drug distribution as necessary to assure that care and services would be provided in a manner consistent with the best interests of Medicaid's requirements, the

federal law did not specifically permit the federal Medicaid program to be used to further

the interests of non-Medicaid recipients. *Id.* at *5. The district court reasoned:

> No matter how modest an obstacle the new prior authorization amounts to (the parties disagree on the severity of the obstacle), it is an obstacle—drugs on the list must be approved by the state Medicaid Medical Director before they can be dispensed or prescribed—and therefore an obstacle to the accomplishment and execution of the Congressional objectives of federal Medicaid.

*Id.* (quotation marks omitted).

"[P]erceiv[ing] no conflict between the [Maine Rx statute] and Medicaid's structure

and purpose," the First Circuit reversed. *Pharmaceutical Research & Manufacturers of*

*America v. Concannon*, 249 F.3d 66, 75 (1st Cir. 2001). The First Circuit noted that

nothing in the text of the federal statute "prevents states from imposing prior authorization

requirements; indeed, they are explicitly permitted." *Id.* After entertaining the argument

that there were federal legislative purposes in "preventing abuse or overprescription of

certain expensive medications," and in "achieving the[] best interests of the Medicaid

recipient," *id.* at 76-77, the court expressed concerns about the possibility of obstruction

but found an "insufficient basis" on the record of competing affidavits at that point in the

proceedings to conclude that the statute presented more than a *de minimis* obstacle to

achieving the goals that the plaintiff had identified. *Id.* at 77.

The Supreme Court affirmed the First Circuit's decision. *Pharmaceutical Research*

*& Manufacturers of America v. Walsh*, 538 U.S. 644, 670 (2003). Reasoning that the

district court erred in concluding that it was sufficient to show any impediment to a

discernable federal goal, a plurality of justices concluded that obstacle preemption required

a showing of more than a "modest" impediment or harm to a federal statutory goal. *Id.* at 665-67 (opinion of Stevens, J.), 671 (Breyer, J., concurring); *compare Townsend v. Swank*, 404 U.S. 282, 286 (1971) (finding preempted an additional "state eligibility standard" that had the effect of excluding from welfare benefits a whole category of persons the federal program deemed eligible for assistance), *with New York State Department of Social Services v. Dublino*, 413 U.S. 405, 421–22 (1973) (not finding complimentary state law work requirements for welfare benefits preempted simply because they might become conditions for continued assistance for some individuals but remanding for further analysis of the eligibility implications of each specific work rule).

Plaintiff contends that by requiring drug manufacturers to provide 340B-priced drugs to multiple pharmacies, the Maine statute impermissibly expands the obligations of manufacturers and, therefore, conflicts with federal law. According to Plaintiff, 340B allows manufacturers to determine the conditions of its offers to sell discounted drugs, which conditions may include requiring claims data and limiting a covered entity to the use of a single contract pharmacy. Plaintiff maintains that the Maine statute "vastly expands the number of 340B transactions[,]" (Motion at 22), and "fundamentally alters the bargain struck by Congress with manufacturers for participation in 340B, Medicare, and Medicaid." (*Id.* at 23.)

Under the reasoning of the Third and D.C. Circuits, congressional silence regarding the conditions that drug manufacturers can include in their offers to sell the drugs to covered entities precludes HRSA from dictating the number of pharmacies to which the manufacturers must deliver on behalf of a covered entity. *Sanofi Aventis*, 58 F.4th 696;

29

**29a**

*Johnson*, 102 F.4th 452.  That silence, however, does not necessarily mean that Congress intended to prevent state involvement or somehow limit the number of legitimate discounted claims.  *See Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Department of Health*, 699 F.3d 962, 985 (7th Cir. 2012) ("The question is not whether [the federal law] expressly allows a recipient state to impose its own subgrant conditions . . . [i]nstead, the pertinent question is whether [the federal law] prohibits state-imposed eligibility conditions, either expressly or by necessary implication.  As we have noted, congressional and regulatory silence usually defeats a claim of preemption, not the other way around.").  The Court discerns nothing in 340B to suggest that Congress intended to limit the number of patients for whom covered entities may prescribe drugs at the discounted rate.  The Court likewise discerns nothing in 340B to suggest that Congress intended for manufacturers to have an unfettered right to adopt policies with the purpose of limiting the number of its patients for whom a covered entity may prescribe drugs at the discounted rate.  For instance, Plaintiffs have offered no reason to believe that Congress intended to limit the number of legitimate discounted claims to a subset of a covered entity's eligible patients that corresponds to patients living in the immediate vicinity or a certain radius from the facility.  Instead of limiting eligibility and participation, in 2010, Congress significantly increased the number of healthcare facilities that are considered covered entities, an expansion that included rural facilities serving patients over a greater geographic area.

Second, Plaintiff asserts there is a significant conflict because the state law remedy overlaps with the federal remedy—namely the ADR process to be followed by a judicial

proceeding—and provides an additional enforcement mechanism beyond the federal remedy for the same conduct.  Plaintiff contends that "[t]he Supremacy Clause does not permit Maine to adopt a scheme that eviscerates the uniformity Congress intended and upsets the bargain Congress set for a federally-created benefit program." (Motion at 29.)

When a federal statute provides a unified administrative remedial scheme for violations of the federal statute, courts typically disfavor statutory interpretations that permit alternate remedies for the same violations, such as implied private rights of action. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 329 (2015) (concluding that the complexity of enforcing the federal statute "coupled with the express provision of an administrative remedy . . . shows that the [statute] precludes private enforcement of [the provision] in the courts"); *Astra*, 563 U.S. at 120.  Similarly, courts have recognized that state efforts to impose additional state law remedies for the same violations of federal law are more likely to be preempted due to the potential to disrupt the tradeoffs embodied in the federal remedial scheme.  *See, e.g., Idaho Building & Construction Trades Council, AFL-CIO v. Inland Pacific Chapter of Associated Builders & Contractors, Inc.*, 801 F.3d 950, 961 (9th Cir. 2015) (finding preemption when a state added a criminal penalty for violating a federal program enforced by federal civil and administrative remedies); *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 193 (4th Cir. 2007) (noting that "the [federal statute] does not explicitly authorize states to create alternative remedies" for violations of the federal statute, and concluding that "in view of the [federal statute]'s unusually elaborate enforcement scheme, there cannot be the exceptionally strong presumption against preemption of such state remedies that would be warranted if the [federal statute]

31

**31a**

did not provide federal remedies"); *Bessette v. Avco Financial Services, Inc.*, 230 F.3d 439, 447 (1st Cir. 2000), *amended on denial of rehearing* (Dec. 15, 2000) ("[T]he broad enforcement power under the Bankruptcy Code preempts virtually all alternative mechanisms for remedying violations of the Code.").

Defendants argue, however, that the Maine statute does not provide additional overlapping remedies for the same federal violations because alleged violations of the state law would not be based on the same overcharging, diversion, and price disputes that are enforced through the federal administrative process.  Defendants' argument has merit. Federal violations like overcharging and diversion are not enforced under the state statute. *See Tompkins v. United Healthcare of New England, Inc.*, 203 F.3d 90, 96 (1st Cir. 2000) (noting that a state law can impair a federal law "to the extent that the [state law] provides a means of enforcing [the federal law's] commands" but there is no impairment if "the practices made unlawful under [the state law] were not unlawful under [the federal law]") (summarizing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983)).

Plaintiff argues that there is the potential for conflicting adjudications because a manufacturer might assert as an affirmative defense in a state enforcement proceeding that the covered entity's drugs which the manufacturer refused to deliver or distribute through a contract pharmacy were not required to be sold at the 340B price under federal law, but it is far from obvious whether or how often such questions would arise.  At least at this stage, the alleged conflict is too speculative to support a finding that Plaintiff is likely to prevail.  *See English v. General Electric Co.*, 496 U.S. 72, 90 (1990) (finding prospect of overlapping state and federal enforcement proceedings "too speculative a basis on which

to rest a finding of pre-emption" because the Supreme Court "has observed repeatedly that pre-emption is ordinarily not to be implied absent an 'actual conflict'").

It is also not clear on this record whether there are any federal remedies available for the conduct the state statute prohibits. The ADR rule provides that ADR is available to a covered entity that "claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. § 10.21(a)(1). Manufacturers have argued that contractual policies limiting a covered entity's distribution of the drugs to patients through contract pharmacies (the subject of the Maine statute) could be challenged in a federal agency proceeding as a limitation on the ability of the covered entity to purchase drugs at or below the ceiling price under the federal law. The Court is not persuaded that such an interpretation presents a significant conflict because HRSA, the governing agency, has adopted a contrary view—a view consistent with the decisions of the Third and D.C. Circuits—that the federal remedy is not available for such conduct because 340B does not address distribution. Again, the alleged conflict is too speculative currently to support a finding that Plaintiff is likely to prevail on the merits of its claim.

Third, Plaintiff argues that the state law's requirement that manufacturers cannot condition participation in the program on the covered entities providing claims data impermissibly conflicts with 340B. A discernible secondary goal of 340B is to prevent improper claims and fraud, and the ADR process is evidently intended to assist in that objective. Manufacturers have argued they need claims data to prevent fraud and meet the "reasonable cause" level of suspicion necessary to initiate an audit. The concern regarding

33

**33a**

access to evidence of possible violations is not unreasonable.  But neither Plaintiff nor the manufacturers have demonstrated that claims data are necessary to obtain an audit or that the proof necessary to obtain an audit is particularly onerous.  For instance, the 340B program and the audit process have existed for many years, but there are apparently no cases where a manufacturer requested but was denied an audit due to a lack of relevant claims data.  As with the other enforcement arguments, on the current record, the alleged impediment is too speculative to support a finding that Plaintiff is likely to prevail on its claim.[11]

Furthermore, the "subtle refram[ing]" of the obstacle preemption inquiry, which the First Circuit has identified in more recent Supreme Court opinions, does not assist Plaintiff. *Cormier*, 51 F.4th at 8.  According to the First Circuit, the Supreme Court has asked whether the federal statute "implicitly confer[s] a right" to engage in certain conduct subject only to certain federal standards and be free from the challenged state regulation. *Id.* (citing *Kansas v. Garcia*, 589 U.S. 191, 210 (2020) and *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453, 479 (2018)).  As discussed above, the limited specified requirements of the 340B program and Congress's silence on all other aspects of the transactions necessary to accomplish the objectives of 340B do not imply that Congress

---

[11] Plaintiff argued previously that there could be a conflict for those manufacturers participating in HRSA's rebate pilot program because its rules require the collection of some claims data.  The State suggested that there would likely be no conflict because under the savings clause of the state statute, the collection of claims data is not prohibited when it is required under federal law.  The Court need not address the issue further as the parties later stipulated that the issue was resolved when the State determined that Chapter 103 is not violated when a manufacturer within the rebate pilot program requires the submission of the specified claims data.  (Stipulation at 3–4, ECF No. 47.)

34

**34a**

intended to confer on manufacturers a right to be free from all state law requirements regarding drug distribution to patients, delivery of a covered entity's property to contract pharmacies, and collection of claims data.

Finally, the other prominent case Plaintiff cites, *Forest Park II v. Hadley*, 336 F.3d 724 (8th Cir. 2003), is not to the contrary. In *Hadley*, the operator of an apartment building financed through a federal subsidized housing program sought to prepay its mortgage and withdraw from the federal program. *Id.* at 727. Although the operator met the federal withdrawal requirements, a state statute imposed additional conditions and different time schedules for withdrawing from the federal program. *Id.* at 730. The Eighth Circuit declined to apply the presumption against preemption based on *Buckman* and found the state statute preempted. *Id.* at 731, 734.

Plaintiff points to certain broad language in the opinion. *See id.* at 732 ("Simply, state statutes may not interfere with the implementation of a federal program by a federal agency.") But other portions of the decision demonstrate that the Eighth Circuit did not adopt the categorical non-targeting rule that Plaintiff contends should apply here. *See id.* at 734 ("We do not suggest that all state attempts at preserving existing federally subsidized, low-income housing are preempted. Nothing . . . indicates that states are prohibited from instituting their own incentive plans or other programs to preserve low-income housing within the framework of the federal prepayment scheme.").

Unlike in this case, the state statute in *Forest Park* imposed requirements inconsistent with the federal rules because they "restrict[ed] the exercise of the participants' federally granted prepayment rights" and used different timelines than the

35

**35a**

federal law, "creat[ing] delays in the prepayment process." *Id.* at 734. In addition, unlike here, that state statute regulated the relationship between the federal agency and the regulated entity rather than relationships between private parties. *See id.* at 732 ("[T]he state law forces the federal government to continue to provide financial assistance to the participant when both the federal government and the participant have chosen to end their relationship."). In other words, the state statute was preempted in *Forest Park* not because of a categorical non-targeting rule but because the degree of conflict or interference was of a far greater magnitude than Plaintiff has shown here.

In sum, on the record at this stage of the proceedings, which record includes competing sworn declarations, the Court is not convinced that Plaintiff is more likely than not to establish that Maine's statute represents more than a modest impediment to drug manufacturers' participation in and the goals of 340B. As related to obstacle conflict preemption, the Court is not persuaded that the state statute interferes with or undermines the available federal remedies or that there is a significant risk that the state law is likely to cause manufacturers to withdraw from or not participate in the 340B program such that the core objectives of the program would be compromised. Plaintiff has failed to establish a likelihood of success on its obstacle preemption claim. *See Fitch*, 152 F.4th at 647–48; *McClain*, 95 F.4th at 1145.

## B.    Other Factors

Because Plaintiff has failed to establish that it will likely succeed on the merits of its intergovernmental immunity or preemption claims, the Court need not address the remaining preliminary injunction factors (irreparable harm, the balance of hardships, and

the public interest). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Services, Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

## CONCLUSION

After an assessment of the factors relevant to Plaintiff's request for a preliminary injunction, the Court concludes that Plaintiff is not entitled to preliminary injunctive relief. Accordingly, the Court denies Plaintiff's motion for a preliminary injunction.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 23rd day of January, 2026.