No. 26-1099

**UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,

*Plaintiff-Appellant*,

v.

AARON M. FREY, in the official capacity as Attorney General of the State of Maine; ROBERT L. CAREY, in the official capacity as Superintendent of the Bureau of Insurance,

*Defendants-Appellees*.

_____

On Appeal from the United States District Court for the District of Maine,
No. 1:25-cv-00469-JCN

_____

**PLAINTIFF-APPELLANT'S REPLY BRIEF**

_____

> ERIN E. MURPHY
>  *Counsel of Record*
> MATTHEW D. ROWEN
> PHILIP HAMMERSLEY[*]
> CAMILO GARCIA[*]
> CLEMENT & MURPHY, PLLC
> 706 Duke Street
> Alexandria, VA 22314
> (202) 742-8900
> erin.murphy@clementmurphy.com
>
> [*] Supervised by principals of the firm who are
>  members of the Virginia bar
>
> *Counsel for Plaintiff-Appellant*

April 22, 2026

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................... ii

INTRODUCTION .................................................................................................. 1

ARGUMENT ......................................................................................................... 2

I.      PhRMA Is Entitled To Preliminary Relief....................................................... 2

      A.      The Supremacy Clause Itself Displaces Chapter 103 .......................... 2

            1.      Chapter 103 unconstitutionally discriminates against drug manufacturers with whom the federal government deals................................................................................. 2

            2.      Chapter 103 unconstitutionally regulates the federal government directly ................................................................... 10

            3.      Chapter 103 unconstitutionally invades the federal government's exclusive prerogative to set conditions on federal spending programs ................................................... 13

      B.      The 340B Statute Preempts Chapter 103 .......................................... 16

            1.      Chapter 103 is field preempted ............................................... 16

            2.      Chapter 103 is conflict preempted .......................................... 22

      C.      The Remaining Factors Favor Injunctive Relief............................... 27

CONCLUSION.................................................................................................... 28

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

**Cases**

*AbbVie Inc. v. Drummond*,
808 F.Supp.3d 1266 (W.D. Okla. 2025) ............................................................19

*Aetna Health Inc. v. Davila*,
542 U.S. 200 (2004)...........................................................................................19

*Alexander v. Choate*,
469 U.S. 287 (1985)..................................................................................... 13, 23

*Ass'n to Pres. & Protect Local Livelihoods v. Sidman*,
147 F.4th 40 (1st Cir. 2025) ..............................................................................23

*Astra USA, Inc. v. Santa Clara Cnty.*,
563 U.S. 110 (2011) ................................................................................ 3, 16, 26

*Barnes v. Gorman*,
536 U.S. 181 (2002)...........................................................................................20

*Boaz Hous. Auth. v. United States*,
994 F.3d 1359 (Fed. Cir. 2021).............................................................................4

*Boeing Co. v. Movassaghi*,
768 F.3d 832 (9th Cir. 2014)..............................................................................11

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988)...........................................................................................13

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001)...........................................................................................13

*Columbus Reg'l Hosp. v. United States*,
990 F.3d 1330 (Fed. Cir. 2021)............................................................................4

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022)...........................................................................................20

*Dawson v. Steager*,
586 U.S. 171 (2019)..............................................................................................7

*Douglas v. Indep. Living Ctr.*,
  565 U.S. 606 (2012)..........................................................................13

*Forest Park II v. Hadley*,
  336 F.3d 724 (8th Cir. 2003)............................................................13

*Hencely v. Fluor Corp.*,
  No. 24-294, slip op. (U.S. Apr. 22, 2026)...........................................4

*Johnson v. California*,
  543 U.S. 499 (2005)............................................................................7

*King v. Smith*,
  392 U.S. 309 (1968)..........................................................................23

*Kress Stores of P.R., Inc. v. Wal-Mart P.R., Inc.*,
  121 F.4th 228 (1st Cir. 2024) ...........................................................22

*Kucana v. Holder*,
  558 U.S. 233 (2010)..........................................................................24

*Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*,
  469 U.S. 256 (1985)..........................................................................14

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819)........................................................5, 6

*Missouri v. Trump*,
  128 F.4th 979 (8th Cir. 2025)............................................................28

*N.Y. Dep't of Social Servs. v. Dublino*,
  413 U.S. 405 (1973)..........................................................................23

*Novartis Pharms. Corp. v. Johnson*,
  102 F.4th 452 (D.C. Cir. 2024) ...................................... 10, 19, 22, 24

*PhRMA v. McCuskey*, --- F.4th ----, 2026 WL 898259
  (4th Cir. Mar. 31, 2026) ............................................................. *passim*

*PhRMA v. Morrisey*,
  760 F.Supp.3d 439 (S.D. W. Va. 2024)..............................................19

*PhRMA v. Walsh*,
538 U.S. 644 (2003)..................................................................13

*Rendleman v. Bowen*,
860 F.2d 1537 (9th Cir. 1988)....................................................5

*Rosario-Urdaz v. Rivera-Hernandez*,
350 F.3d 219 (1st Cir. 2003) .....................................................28

*Sanofi Aventis U.S. LLC v. HHS*,
58 F.4th 696 (3d Cir. 2023)........................................... 10, 19, 22, 24

*United States v. Callahan Walker Constr. Co.*,
317 U.S. 56 (1942)......................................................................4

*United States v. King Cnty.*,
122 F.4th 740 (9th Cir. 2024).....................................................11

*United States v. Locke*,
529 U.S. 89 (2000)....................................................................21

*United States v. Washington*,
596 U.S. 832 (2022)........................................................ *passim*

*Wyeth v. Levine*,
555 U.S. 555 (2009)..................................................................26

## Statutes

24-A M.R.S.A. §7752 ....................................................................2

24-A M.R.S.A. §7753(1)......................................................... 18, 26

24-A M.R.S.A. §7753 ....................................................................2

24-A M.R.S.A. §7754(3)................................................................19

42 U.S.C. §1396a(a)(19).................................................................13

42 U.S.C. §256b(d)(3)...................................................................26

## Rules and Regulations

42 C.F.R. §10.21(a)(1) .................................................................26

iv

48 C.F.R. §§52.000 to 52.253-1 ................................................................6

61 Fed. Reg. 65,406 (Dec. 12, 1996) ......................................................25

**Other Authorities**

Dep't of Veterans' Affs., Veterans Care Agreement,
https://perma.cc/ES2V-DJNX ............................................................6

HRSA, OMB No. 0915-0327, Sample PPA Addendum,
https://perma.cc/3YZ5-7X52 ............................................................10

U.S. Gov't Accountability Off., GAO-18-480, *Federal Oversight of
Compliance at 340B Contract Pharmacies Needs Improvement*
(2018), https://perma.cc/2UD9-KFLU .............................................24

William Sarraille et al., IQVIA, *Do 340B Contract Pharmacies Really
"Increase Access" for 340B Patients?* (2025),
https://perma.cc/JW35-4CJ4 ............................................................24

**INTRODUCTION**

Maine's brief confirms that Chapter 103 cannot be reconciled with the Supremacy Clause. The state openly admits that Chapter 103 imposes state-law restrictions *only* on pharmaceutical manufacturers "that participate in the 340B Program." ME.Br.12. That should be the end of this case. By singling out for special state-law obligations participants in a federal spending program, Chapter 103 not only runs afoul of the Supremacy Clause's antidiscrimination principle, but intrudes on an exclusively federal field—as the Fourth Circuit recently held when affirming a preliminary injunction against a materially identical West Virginia law. Unsurprisingly, Maine's decision to insert itself into a federal program where it does not belong also creates a host of conflicts with Congress's carefully calibrated regime—as the Fourth Circuit also recently held in the West Virginia case.

Unable to deny those fundamental conflicts, Maine mischaracterizes both PhRMA's arguments and the state's own statute. But Maine's attempt to hide the ball on how Chapter 103 really works cannot change the fact that it does exactly what the Fourth Circuit just held a state cannot do: It alters the terms of participation in the federal 340B Program, and interferes with Congress's exclusive federal enforcement scheme to boot. The district court thus erred as a matter of law in denying PhRMA preliminary relief.

ARGUMENT

**I.      PhRMA Is Entitled To Preliminary Relief.**

**A.      The Supremacy Clause Itself Displaces Chapter 103.**

Chapter 103 cannot be squared with the Supremacy Clause.  Maine's response confirms that, in three independent ways, the state has arrogated to itself authority that the Constitution reserves to the federal government alone.  Chapter 103 discriminates against entities with whom the federal government has chosen to deal, directly regulates the federal government's own operations, and grafts state-law conditions onto a federal spending program that leaves no role for the states.  For any and all of those reasons, it cannot stand.

**1.      Chapter 103 unconstitutionally discriminates against drug manufacturers with whom the federal government deals.**

Maine does not deny that Chapter 103 singles out manufacturers that participate in the federal 340B Program for special state-law obligations that do not apply to manufacturers who do not participate in the federal 340B Program.  *See* PhRMA.Br.25-35.  Nor could it:  Chapter 103 "targets *only* manufacturers that participate in the [federal] 340B program," and it "imposes restrictions only on drug manufacturers when they *comply* with their end of the 340B bargain."  *PhRMA v. McCuskey*, --- F.4th ----, ----, 2026 WL 898259, at *9 (4th Cir. Mar. 31, 2026) (affirming a preliminary injunction against West Virginia's materially identical law); *see* 24-A M.R.S.A. §§7752, 7753; PhRMA.Br.15-16.  At its core, then, Chapter 103

2

flouts the hierarchy enshrined in the Supremacy Clause, which "prohibits States from enacting discriminatory laws unless Congress clearly and unambiguously" authorizes them to do so, *United States v. Washington*, 596 U.S. 832, 843 (2022)—something that Maine does not and cannot claim Congress did here.  None of the arguments the state offers in defense of Chapter 103 gets around that constitutional violation.

a.      At the outset, Maine (at 27-30) insists that intergovernmental-immunity principles have no relevance to this case.  In the state's view, those principles apply only when private parties are "true" federal contractors that have "actual contractual arrangements" with the federal government, which Maine claims manufacturers that participate in the federal 340B Program do not.  ME.Br.28-29.  That argument is wrong at every step.

To begin, Maine is wrong that manufacturers that participate in the 340B Program "are not federal contractors" in the relevant sense.  ME.Br.27. Manufacturers participate in the 340B Program pursuant to contracts (the "A" in PPA stands for "Agreement"), and the parties to these contracts are manufacturers and the U.S. Secretary of Health and Human Services.  *See Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 114, 115 (2011); App.132.  Manufacturers that sign PPAs (and thereby become obligated to offer their products to certain entities at steeply reduced prices) are thus federal contractors in the sense that matters here—*i.e.*, they

3

have been enlisted by the government to help accomplish federal ends. Accordingly, even by Maine's standard, the intergovernmental-immunity doctrine applies with full force here. *See* ME.Br.27 (agreeing that intergovernmental immunity protects federal contractors).[1]

Maine insists that PPAs are not "true" contracts for intergovernmental-immunity purposes because they do not contain bargained-for terms. ME.Br.28-29. But it never explains why that would make any constitutional difference. The federal government routinely uses form contracts to advance federal objectives. *See, e.g.*, *United States v. Callahan Walker Constr. Co.*, 317 U.S. 56, 56 (1942) (construction contract); *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1362 (Fed. Cir. 2021) (housing contract); *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1336, 1340 (Fed. Cir. 2021) (FEMA contract). Yet neither the Supreme Court nor any other court has ever suggested that matters. That makes sense: There is no principled basis for confining intergovernmental-immunity protections to parties who bargain over the terms of their contracts. Protecting "those with whom [the federal

---

[1] Manufacturers "are not [government] agencies and do not perform governmental functions" just by virtue of having contracted with the federal government. Slip op. 14, *Hencely v. Fluor Corp.*, No. 24-294 (U.S. Apr. 22, 2026). But that does not mean that states may *discriminate* against them because of their relationship with the federal government—as evidenced by the fact that *Washington* invalidated under the nondiscrimination principle a state law that "all parties [t]here agree[d] … applie[d] only to federal contract workers and not to federal employees." 596 U.S. at 836.

4

government] deals" from discrimination, *Washington*, 596 U.S. at 838, is (one of) the means by which the doctrine protects the federal government from state efforts to "retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the [national] government." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819). It would make scant sense for that protection to fall by the wayside every time the government refuses to bargain over the terms of a contract. By Maine's logic, a state could levy a $10 million-a-day fine on every private entity that enters a form contract with the federal government without even triggering Supremacy Clause scrutiny. That is not, and cannot be, the law.

For largely the same reasons, it likewise makes no difference that the PPA's contractual provisions incorporate obligations from the federal 340B statute. *Contra* ME.Br.28-29. To be sure, the source of contractual obligations may sometimes matter when deciding whether statutory- or contract-interpretation principles govern the construction of the agreement. *See* ME.Br.29 (quoting *Rendleman v. Bowen*, 860 F.2d 1537, 1542 (9th Cir. 1988)). But Maine cites no authority suggesting that it makes a difference for purposes of whether intergovernmental-immunity protections apply. To adopt Maine's position would work a sea change in constitutional law, as many contracts with the federal government incorporate obligations set forth in statutes or regulations. *See, e.g.*, Dep't of Veterans' Affs., Veterans Care Agreement,

5

https://perma.cc/ES2V-DJNX (last visited April 22, 2026); *cf.* 48 C.F.R. §§52.000 to 52.253-1 (listing standard clauses for federal acquisition contracts). If all of those contracts were fair game for state regulation and even discrimination, *see* pp.2, 4, *supra*, then the intergovernmental-immunity doctrine would leave the federal government wholly unprotected from state efforts to "retard, impede, burden, or … control[] the operations of" the federal government, *McCulloch*, 17 U.S. at 436, owing to the happenstance that Congress memorialized certain contract terms in a statute. Again, that is not, and cannot be, the law.

Maine's sole basis for claiming otherwise is a line of dicta from the Fourth Circuit's recent decision in *McCuskey*. *See* ME.Br.29-30. That is a curious case for the state to invoke, as *McCuskey* squarely held that a West Virginia law materially identically to Maine's law is likely preempted. 2026 WL 898259, at *13. And while Maine points to dicta noting that "the intergovernmental-immunity doctrine [did] not control" the Fourth Circuit's decision, the state neglects to mention that the court went on to explain that "the same concerns animating the intergovernmental-immunity doctrine counsel skepticism" of laws that, like West Virginia's law there and Maine's law here, "single[] out those manufacturers that have effectively contracted with the federal government" under the 340B Program. *Id.* at *7. *McCuskey* thus rejected Maine's view that intergovernmental-immunity principles have no relevance in this context.

6

In all events, the dicta that Maine prefers to the court's actual holding came in a case where, while the parties certainly relied on intergovernmental-immunity principles, no party specifically argued (as PhRMA has here) that the doctrine squarely "control[led]" the outcome, and the court lacked the benefit of the United States' views that the doctrine is not only relevant, but in fact controlling, in this context.   U.S.Br.11-16.   Moreover, as the Fourth Circuit explained, even if intergovernmental-immunity principles may not "control," they would still compel the conclusion that the 340B Program is an exclusively federal field that states do not have the power to directly regulate.  Chapter 103, of course, fails for that reason too.  *See* pp.16-22, *infra*.

b.   Maine next argues that it has not engaged in any impermissible discrimination because "PhRMA provided no evidence that Chapter 103 treats someone else better than PhRMA's manufacturers."  ME.Br.30.  That is doubly wrong.  At the outset, PhRMA did not need to provide "evidence" about which entities Chapter 103 favors and disfavors because the discrimination is plain on the face of the statute.  *See Dawson v. Steager*, 586 U.S. 171, 175 (2019) (invalidating a law because it "expressly affords" benefits to state law enforcement retirees but not federal law enforcement retirees); *cf. Johnson v. California*, 543 U.S. 499, 509 (2005) ("[A]n express racial classification … is immediately suspect.").  Manufacturers that have an agreement with the federal government to participate in

7

the 340B Program are required to comply with Chapter 103; manufacturers without such an agreement are not. PhRMA.Br.25-26; *see* p.2, *supra*. That is all the "evidence" needed to find discrimination.

An example illustrates the flaw in Maine's contrary position. Suppose (as is likely true) that every institution of higher education in Maine that is accredited accepts federal funds in exchange for complying with the attached federal conditions. Could Maine pass a law that fines institutions $10 million if and only if they accept federal funds? No. That would discriminate against those with whom the federal government deals. And that discrimination could not be excused just because the $10 million fine had not yet proven sufficiently substantial to dissuade a school from taking federal funding and the conditions that Congress attaches to it. That is because the nondiscrimination principle protects the federal government against the risk, not just the actuality, that states will impede its efforts to partner with private parties to accomplish federal ends. *See Washington*, 596 U.S. at 838. Whether laws like Maine's have forced any manufacturers to withdraw from the 340B Program is therefore beside the point; it is enough that discrimination against those who partner with the federal government inherently threatens to do so.

Indeed, Maine implicitly concedes as much by declining to defend the district court's alternative holding that, even assuming Chapter 103 discriminates against federal contractors, the "additional rules" it imposes on "340B participants are [not]

8

sufficiently burdensome to support a finding that Maine seeks to improperly favor nonparticipating manufacturers over participating manufacturers." Add.15a. As Maine itself seems to recognize, the whole point of the nondiscrimination principle is that discrimination against the federal government or those with whom it deals is *inherently* improper. *See* PhRMA.Br.34; U.S.Br.19-20. The degree of burden imposed by a discriminatory state law is neither here nor there.

In all events, PhRMA *did* identify a "comparable actor that Chapter 103 favors." ME.Br.30. Both PhRMA's opening brief and the amicus brief from the United States explained that Chapter 103 treats Bausch Health, which does not participate in the 340B Program, better than manufacturers that do. *See* PhRMA.Br.33-34; U.S.Br.19-20. Like PhRMA's members, Bausch manufactures pharmaceutical products. *See* PhRMA.Br.34. Like PhRMA's members, Bausch sells those products in Maine. *See* PhRMA.Br.34. And like PhRMA's members, Bausch puts conditions on its offers to sell those products; it does not give them away for free. Bausch and PhRMA's members are thus comparable in every relevant way save one: whether they have a federal contract with the federal government to participate in the federal 340B Program. And solely because Bausch does not, it need not comply with Chapter 103. Maine's failure to acknowledge or address that comparator, despite faulting PhRMA for purportedly not identifying one, ME.Br.30, is inexplicable.

9

**2.      Chapter 103 unconstitutionally regulates the federal government directly.**

In addition to unconstitutionally discriminating against those with whom the federal government has chosen to deal, Chapter 103 unconstitutionally regulates the federal government directly by (a) dictating how manufacturers must perform their contractual obligations under the PPA and (b) saddling HRSA with additional regulatory obligations.  PhRMA.Br.35-38.

Maine notably does not dispute that Chapter 103 forces participating manufacturers to modify how they fulfill their contractual obligation to HRSA to "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price."  HRSA, OMB No. 0915-0327, Sample PPA Addendum, https://perma.cc/3YZ5-7X52 (last visited April 22, 2026); *see* PhRMA.Br.34-35. That concession is understandable.   Before Maine enacted Chapter 103, manufacturers satisfied that contractual obligation so long as they offered to sell their drugs at or below 340B prices, even if they conditioned their offers on covered entities' agreeing to abide by one-contract-pharmacy and claims-data conditions. *See Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 463-64 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703-06 (3d Cir. 2023).  Because of Chapter 103, however, manufacturers can no longer discharge that obligation to the federal government in that manner, as doing so would violate Maine's law.  By dictating how manufacturers may satisfy a contractual obligation to the federal

10

government, Chapter 103 regulates "the effective terms of [the] federal contract itself," and thereby "directly interferes with the functions of the federal government." *Boeing Co. v. Movassaghi*, 768 F.3d 832, 840 (9th Cir. 2014).

Far from helping Maine's case, *contra* ME.Br.25-26, *Boeing* refutes it. The fatal problem with California's law in *Boeing* was that it "mandat[ed] the ways in which Boeing renders services that the federal government hired Boeing to perform." *Id.* Chapter 103 is no different: By dictating what terms manufacturers may include in their federal 340B offers, Maine's law "mandat[es] the ways in which [PhRMA's members] render[] services that the federal government [contracted with them] to perform." *See id.*

It makes no difference that PhRMA's members are not federal instrumentalities. *Contra* ME.Br.24-25. Chapter 103 regulates how manufacturers perform their obligations to the United States under a federal contract. That, in turn, regulates the United States by changing the bargain HRSA struck. *See* PhRMA.Br.36-37. Nor does it make any difference whether Chapter 103 "overrides [or] replaces any PhRMA manufacturer's obligations under the 340B Statute." *Contra* ME.Br.26. The direct-regulation doctrine asks whether a state has engaged in direct regulation, not whether it has directly regulated the federal government or those with whom it deals in a manner that conflicts with federal law. *See, e.g., United States v. King Cnty.*, 122 F.4th 740, 756 (9th Cir. 2024) (holding that a county

11

executive order directly regulated the federal government by banning private contractors from operating flights out of a particular airport even though federal law did not require contractors to fly out of that airport).  If the direct-regulation doctrine applied only when a state's direct regulation conflicted with federal law, then the doctrine would collapse into conflict preemption.  In reality, the constitutional injury adheres whenever the state purports to dictate how the federal government's partners must fulfill their obligations to the federal government.  That is precisely what Chapter 103 does.

Unable to deny as much, Maine tries to blame *the federal government* for the additional work that Chapter 103 foists upon the agency.  As Maine sees it, HRSA's 2010 guidance allowing covered entities to affiliate with multiple contract pharmacies is the true culprit for the increased oversight obligations that the explosion of contract-pharmacy arrangements has produced.  ME.Br.26-27.  To be sure, that guidance unquestionably opened the door to a massive increase in the use of contract pharmacies.  *See* PhRMA.Br.10-11.  But as the Third and D.C. Circuits squarely held, the federal 340B statute tempers those regulatory burdens by allowing manufacturers to impose reasonable conditions on their offers to sell drugs at 340B prices, *see* PhRMA.Br.44-47, including one-contract-pharmacy and claims-data requirements.  By destroying those safeguards, Chapter 103 reopens the contract-pharmacy floodgates that the *Sanofi* and *Novartis* decisions should have closed.  Just

as in *Forest Park II v. Hadley*, 336 F.3d 724 (8th Cir. 2003), then, Chapter 103 *does* affect "the actions of the federal government under its own federal program," ME.Br.31 (quoting *Forest Park II*, 336 F.3d at 732), as the additional obligations that HRSA must bear are a direct result of Maine's law.  *See* pp.10-11, *supra*.

### 3.    Chapter 103 unconstitutionally invades the federal government's exclusive prerogative to set conditions on federal spending programs.

Chapter 103 unconstitutionally intrudes on the federal government's unique and exclusive interest in setting the terms of participation in a spending program that "originates from, is governed by, and terminates according to federal law." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001); *see also Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988); PhRMA.Br.37-40; *McCuskey*, 2026 WL 898259, at *6-13.

Maine acknowledges that the Supreme Court has held "that states cannot regulate subject matter that is inherently and uniquely federal."  ME.Br.35.  But it insists that this principle does not bar states from "regulat[ing] within the confines of a federal program."  ME.Br.35.  The sole case the state cites for that proposition, however, is *PhRMA v. Walsh*, 538 U.S. 644 (2003), which involved Medicaid—a "cooperative federal-state program," *Douglas v. Indep. Living Ctr.*, 565 U.S. 606, 610 (2012), that Congress has given states "substantial discretion" to shape, *Alexander v. Choate*, 469 U.S. 287, 303 (1985) (citing 42 U.S.C. §1396a(a)(19)),

13

because states themselves are the recipients of the federal funds. In other words, states have a regulatory role under Medicaid *because Congress chose to give them one* in light of the nature of that particular program, not because states have some inherent power to regulate the terms of federal programs.

Maine protests that, if the terms of the 340B Program implicate "uniquely federal interest[s]," then so do the terms of participation in "nearly *every* federal program." ME.Br.33. That argument serves only to underscore the fundamental flaw in Maine's position. Of course every federal program implicates federal interests. But that does not mean that Congress cannot give states a role to play in such programs—as it frequently does when it embarks on cooperative federal-state partnerships like Medicaid. *See McCuskey*, 2026 WL 898259, at *1-2. When states try to add conditions that are parasitic to a federal spending program that gives states zero role (like 340B), the Supreme Court has invalidated such efforts without hesitation—as it did in *Lawrence County v. Lead-Deadwood School District No. 40-1*, 469 U.S. 256, 260-70 (1985), a case that Maine ignores, *see* PhRMA.Br.40 (citing *Lawrence County*); *see also McCuskey*, 2026 WL 898259, at *7 (concluding that *Lawrence County* stands for the proposition that "a State may not obstruct the federal bargain by adding conditions to it"). "State regimes targeting participants in spending-power [programs]" in which Congress *has not* given the states a role "frustrate Congress's very exercise of its spending power." *McCuskey*, 2026 WL

14

898259, at *10. Maine claims that Chapter 103 does not interfere with any uniquely federal interest because it does not impact how much money the United States spends on "drugs that are covered under Medicaid and Medicare Part B." ME.Br.33. That is a non-sequitur. PhRMA has never argued that Chapter 103 alters how much federal money a manufacturer receives under those federal programs. The problem with Maine's law is that it impermissibly adds additional conditions on *access to* those federal funds. If a manufacturer wants its drugs to be covered by Medicaid and Medicare Part B, now it must not only bear the burden of participating in the federal 340B Program, but must also comply with obligations that Chapter 103 imposes only on participants in that program. By making it more costly for manufacturers to participate in the 340B Program, Maine has interfered with Congress's exclusive power to set the terms of federal spending power programs. *See* PhRMA.Br.39-41 (collecting cases for the proposition that the federal government alone has authority to set terms on the receipt of federal funds).

Finally, Maine fares no better with its argument that Chapter 103 does not implicate any federal interest in the 340B Program because it "govern[s] the relationships between private parties" (*i.e.*, manufacturers and covered entities), not "the United States's contractual rights or obligations." ME.Br.33 (citing *Boyle*, 487 U.S. at 504). As explained, that is simply wrong: By altering the terms of participation in the 340B Program, Chapter 103 interferes with manufacturers' rights

15

and obligations under their PPAs, which are federal contracts with a federal agency. That, Maine cannot do.

## B. The Federal 340B Statute Preempts Chapter 103.

The foregoing suffices to establish that PhRMA will likely succeed on its Supremacy Clause claim. But Chapter 103 also violates the Supremacy Clause because it is preempted by the federal 340B statute under settled field- and conflict-preemption principles.

### 1. Chapter 103 is field preempted.

Until state laws like Chapter 103 barged in, the 340B Program was an exclusively federal operation. That state of affairs was no accident. 340B is a federal spending program, so the federal government—and, specifically, Congress—sets the conditions for participation as part of a fundamentally federal bargain: Manufacturers agree to effectuate Congress's policy goal of providing patients of certain non-profit healthcare providers access to reduced-price drugs in exchange for the federal government's agreement to reimburse their drugs under Medicare and Medicaid. *Astra*, 563 U.S. at 115. And because the Program operates via contract rather than via direct mandate, no one other than Congress—not even the federal agency tasked with enforcing 340B—may add obligations above and beyond those set forth in the statute and reified in the PPA. Maine's law intrudes on that federal regime. If manufacturers wish to continue participating in the federal 340B

16

Program, they now must also abide by Maine's new conditions or face the threat of civil liability. Chapter 103 thus trespasses in an exclusively federal field.

The Fourth Circuit's recent decision in *McCuskey* drives that point home. There, the court held that West Virginia's law—materially similar to Chapter 103—is likely preempted because (among other things) it "directly changes the terms of drug manufacturers' federally created 340B relationships with covered entities" and thus "alters the 340B program's fundamental bargain." 2026 WL 898259, at *9. Because "Congress has ousted the States from [the] field" of controlling the terms of participation in a federal spending program between the federal government and private entities, *id.* at *9-10, West Virginia has no power to insert itself in that manner, *id.* at *12.

*McCuskey*'s reasoning applies with full force here. Like West Virginia's law, Maine's Chapter 103 "attempt[s] to alter [the 340B] bargain by singling out federal program participants for extra burdens," and thereby intrudes on the federal government's exclusive power to set the terms on which federal funds are disbursed. *Id.* at *13. That intrusion "threatens the efficacy of Congress's spending-power scheme today *and* its ability to effectively use its spending power to encourage private participation in future bargains," *id.* at *10, and impermissibly regulates in an area that is reserved exclusively for the federal government, *id.* at *13.

17

Maine cannot redefine the relevant field as "the practice of pharmacy" or the "delivery and distribution of prescription drugs." ME.Br.38. Although at "a high level of generality" the law "regulates the pharmaceutical industry," Chapter 103 "is anything but a traditional health-and-safety regulation." *McCuskey*, 2026 WL 898259, at \*7. The law does not subject the practice of pharmacy "to any obligations or restrictions independent of the federal 340B program." *Id.* Unlike a genuine and generally applicable state effort to regulate the pharmaceutical practice, Chapter 103 "injects the State into 'the relationship between a federal agency and the entity it regulates,' which is 'inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law.'" *Id.* States have no role to play in that exclusively federal field. *See id.* at \*13; pp.16-22, *supra*.

Maine insists (at 39-42) its statute does not intrude upon the 340B Program because it covers only drug delivery and distribution, not pricing. That is irrelevant to the field-preemption analysis, as Congress has ousted states from playing *any* role in establishing the conditions of participation in the federal 340B Program; that is what it means for Congress to preempt a field. It is also wrong, as the notion that Chapter 103 regulates only delivery is belied by the statute's plain text, which prohibits manufacturers from placing conditions on "acquisition," not just "delivery," of 340B-priced drugs. *See* 24-A M.R.S.A. §7753(1). Chapter 103 thus regulates when parties must *sell* drugs at federal 340B prices, not merely where or

18

to whom they must deliver them post-sale. By prohibiting manufacturers from imposing contract-pharmacy or claims-data conditions on their offers to *sell* drugs to covered entities at 340B prices, *see id.*, the law prevents manufacturers from refusing to sell drugs at 340B prices in circumstances where federal law allows them to do so, *see Novartis*, 102 F.4th at 460-64; *Sanofi*, 58 F.4th at 703-06, thereby compelling manufacturers to make sales at 340B prices that they would otherwise not make, *see* PhRMA.Br.16; *McCuskey*, 2026 WL 898259, at *9. Chapter 103 thus "isn't really regulating the delivery of drugs to those contract pharmacies, but rather the price at which those drugs must be sold." *AbbVie Inc. v. Drummond*, 808 F.Supp.3d 1266, 1276 (W.D. Okla. 2025). Indeed, to the extent Chapter 103 regulates delivery at all, it regulates only "delivery *at a given price*, not delivery *per se*." *PhRMA v. Morrisey*, 760 F.Supp.3d 439, 455 (S.D. W. Va. 2024), *aff'd*, *McCuskey*, 2026 WL 898259.[2]

---

[2] Maine argues (at 41) that Chapter 103 expressly disclaims any intent to regulate pricing. Of course, preemption turns on substance, not labels. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 214 (2004). But that aside, the provision of the law that Maine cites for that proposition, 24-A M.R.S.A. §7754(3), does no such thing. Section 7754(3) explains that "a health insurance issuer, pharmacy benefits manager or other 3rd-party payor or agent may not … [r]equire a 340B entity to reverse, resubmit or clarify a claim after the initial adjudication unless these actions are in the normal course of pharmacy business and are not related to 340B drug pricing." *Id.* That provision, which does not regulate manufacturers, has nothing to do with whether Chapter 103's separate ban on contract-pharmacy and claims-data conditions regulates pricing.

19

In all events, even assuming that the federal 340B statute were "silent" on the propriety of contract-pharmacy and claims-data conditions, ME.Br.40, that would not be an invitation for states to impose them. It would be confirmation that restrictions on such conditions may not be imposed—whether by the federal government or by the states. In the spending-power context, a private party's obligations derive from an agreement in the nature of a contract, not from the federal government's "sovereign authority to enact binding laws." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022). For that agreement to be valid, the private party must "voluntarily and knowingly accept[] the terms of th[at] contract." *Id.* Because a party cannot agree to terms if it does not know what they are, it is well-settled law that the terms of a spending power program must be clearly set forth in advance. *See Barnes v. Gorman*, 536 U.S. 181, 186-87 (2002). Thus, just as "silence" doomed HHS's argument that it may impose conditions not found in the statute, silence dooms any argument that states are free to impose conditions of their own. When manufacturers made the decision to enter the 340B Program, they could "voluntarily and knowingly" accept only the obligations that Congress and the PPA clearly set out, *id.*, and neither set out any duty to sell drugs at 340B prices according to whatever additional terms states might later impose. *See McCuskey*, 2026 WL 898259, at *1, *7-8 (so holding).

20

Maine cannot evade those problems by invoking the presumption against preemption, *contra* ME.Br.36-38, as the Fourth Circuit's recent decision makes clear, *see McCuskey*, 2026 WL 898259, at *6-8.  For one thing, that presumption "is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000).  And until laws like Chapter 103 started storming the stage just a few years ago, the 340B Program was an exclusively federal one.  Moreover, Maine's law is neither longstanding nor generally applicable; it was enacted just this past year, and it applies only to pharmaceutical manufacturers that participate in the federal 340B Program.  *See* pp.2-3, *supra*; *McCuskey*, 2026 WL 898259, at *6-8.

In short, the presumption against preemption has no role to play here.  The governing rule is instead that the Supremacy Clause "prohibits States from enacting discriminatory laws unless Congress clearly and unambiguously" authorizes them to do so.  *Washington*, 596 U.S. at 843.  And no one—not even Maine—argues that Congress has given any indication of wanting to empower states to layer their own participation conditions onto the federal 340B Program.  While that suffices to show that Chapter 103 is foreclosed by intergovernmental-immunity and spending-power principles, *see* Part I, *supra*, it also suffices to show that Chapter 103 is field preempted by the federal 340B statute.

21

### 2.    Chapter 103 is conflict preempted.

Having invaded federal territory, Chapter 103 wars with the 340B regime on several fronts.  Maine's efforts to downplay those conflicts fail.

a.    To begin, Chapter 103 conflicts with the 340B statute by eliminating the discretion the federal statute affords manufacturers to impose one-contract-pharmacy and claims-data conditions.  *See* PhRMA.Br.44-48.  Maine insists (at 44-46) that states may outlaw those conditions because Congress was "silent" about what terms manufacturers can include on their offers to sell 340B-priced drugs.  But that is not what the *Novartis* and *Sanofi* cases held—because that is wrong.

To be sure, those courts acknowledged that the statutory *text* is "silent" about what conditions manufacturers may impose.  *Novartis*, 102 F.4th at 460; *see Sanofi*, 58 F.4th at 703.  But the courts did not end there; both instead recognized that the meaning of a statutory provision often becomes clear when statutory "structure" and "context" are considered.  *See Kress Stores of P.R., Inc. v. Wal-Mart P.R., Inc.*, 121 F.4th 228, 234 (1st Cir. 2024) (per curiam).  And after examining the federal 340B statute as a whole, both courts concluded that, while the statute does not bar the kinds of conditions Maine seeks to outlaw, it may well bar *some* conditions notwithstanding that textual "silence."  *Novartis*, 102 F.4th at 460; *see Sanofi*, 58 F.4th at 705-06.  In other words, the courts concluded that the 340B statute (and thus the PPA) *does* speak to what conditions may be imposed; it just does not say what

22

Maine would prefer it said. This Court's decision in *Association to Preserve & Protect Local Livelihoods v. Sidman*, 147 F.4th 40 (1st Cir. 2025), thus has no bearing here, *contra* ME.Br.45, because the federal 340B statute *does* "address" a manufacturer's ability to impose reasonable conditions on its 340B offers. *See Sidman*, 147 F.4th at 50; pp.18-20, *supra*.

      b.      Switching gears, Maine returns to spending-power principles, accusing PhRMA of citing "no case or other authority for" the proposition that states cannot impose terms of participation in a federal spending program unless Congress invites them to do so clearly and unambiguously. ME.Br.46. But Maine's own cases illustrate that states may add terms of participation *only when Congress invites them to do so*. As explained*, Walsh* involved Medicaid, a cooperative federal-state program that Congress has given states "substantial discretion" to shape. *Choate*, 469 U.S. at 303. And *New York Department of Social Services v. Dublino*, 413 U.S. 405 (1973) (cited at 47), involved the Aid to Families with Dependent Children ("AFDC") program, *id.* at 409-13, which likewise is "based on a scheme of cooperative federalism": Though AFDC is "financed largely by the Federal Government," it is "administered by the States." *King v. Smith*, 392 U.S. 309, 316 (1968). The federal 340B Program, by contrast, gives states no role whatsoever—for the understandable reason that it is a federal-private program, not a federal-state

23

program.  That is why states have a role to play in programs like Medicaid and AFDC, but not here.  *McCuskey*, 2026 WL 898259, at \*2, \*7.

c.       Though it ultimately does not matter since no law pursues its purposes at all costs, *Kucana v. Holder*, 558 U.S. 233, 252 (2010), Maine's efforts to square Chapter 103's prohibition on contract-pharmacy conditions with the 340B Program's purposes also come up short.  Maine notes that HRSA issued guidance in 2020 that "require[d] drug manufacturers" to offer 340B-priced drugs "to an unlimited number of contract pharmacies."  ME.Br.31 (emphasis omitted).  But Maine elides what happened next:  Federal courts of appeals unanimously held that guidance unlawful because it conflicted with the text *and purposes* of 340B.  *See Novartis*, 102 F.4th at 462; *Sanofi*, 58 F.4th at 705-06.  HRSA's ill-fated 2020 guidance, and the judicial decisions it spawned, are thus strong evidence that Chapter 103, like HRSA's guidance before it, stretches the federal 340B Program far beyond what Congress envisioned.  PhRMA.Br.14-15.[3]

---

[3] At any rate, the state's claims about its law's impact on patient access and drug pricing, *see* ME.Br.43-44, 47-48, are misleading.  The contract-pharmacy conditions Chapter 103 prohibits do not impose any restrictions on patients' access to medicines covered by the 340B Program.  *See* William Sarraille et al., IQVIA, *Do 340B Contract Pharmacies Really "Increase Access" for 340B Patients?* 1, 8 (2025), https://perma.cc/JW35-4CJ4.  Nor do they preclude covered entities from passing on 340B-reduced pricing to as many patients as they wish.  It is covered entities themselves that routinely decline to do so.  *See* U.S. Gov't Accountability Off., GAO-18-480, *Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* 30-32 (2018), https://perma.cc/2UD9-KFLU.

24

d.      As to Chapter 103's prohibition on claims-data conditions, Maine says (ME.Br.48-49) that manufacturers do not actually need that information to conduct an audit and access the federal Administrative Dispute Resolution ("ADR") process. That is another red herring.  Whether it closes the door all or just most of the way, Chapter 103 undeniably frustrates manufacturers' ability to access ADR.  Obstacle-preemption problems do not disappear just because a state law may not entirely foreclose the operation of a federal regime.  In any event, the state does not dispute HRSA's view that manufacturers must possess "documentation which indicates that there is reasonable cause" to launch an audit before doing so.  61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996).  And it has supplied no reason to doubt that claims data is "*the* way" to document that reasonable cause.  *Drummond*, 808 F.Supp.3d at 1278.

e.      Finally, Maine insists that its law poses no conflict with Congress's exclusively federal enforcement regime because "[c]laims subject to enforcement under Chapter 103 are … distinct from those reserved to HRSA or designated for ADR."  ME.Br.51.  Congress, the Supreme Court, and the Fourth Circuit would all beg to differ.  *See McCuskey*, 2026 WL 898259, at *12 (explaining how West Virginia's materially analogous claims-data restrictions "interfere … at an operational level with HHS's enforcement authority and specific enforcement activities").  Congress explicitly required "the Secretary" of HHS to "promulgate regulations to establish and implement an administrative process for the resolution

25

of claims by covered entities that they have been overcharged for drugs purchased under [340B]." 42 U.S.C. §256b(d)(3)(A). The ensuing federal ADR rule—which has "the force of law," and thus "pre-empt[s]" state law, *Wyeth v. Levine*, 555 U.S. 555, 576 (2009)—defines the jurisdiction of the federal ADR tribunal to include claims that "a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. §10.21(a)(1). HHS—in which Congress delegated relevant authority—thus has made clear its view that questions about whether a manufacturer has unlawfully limited a covered entity's ability to acquire drugs at the 340B price belong in the federal 340B ADR tribunal. And the Supreme Court in *Astra* held that the ADR tribunal's jurisdiction over issues within its congressionally delegated bailiwick is exclusive. *See* 563 U.S. at 116-17, 120-22.

Maine wants its own state courts to decide those exact questions. In an enforcement action under Chapter 103, the question will not be whether the manufacturer *delivered* drugs to a contract pharmacy. The question will be whether a manufacturer "restrict[ed], … either directly or indirectly," a covered entity's ability to "acqui[re]" drugs *at 340B prices*. 24-A M.R.S.A. § 7753(1). That question is indistinguishable from the question whether a manufacturer "has limited [a] covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. §10.21(a)(1). But, again, HHS has made clear that it has

26

authority to address that exact question through the federal ADR process.  And both Congress and the Supreme Court have made clear that the federal ADR process is the exclusive forum for resolving such disputes.

Maine now seeks to address the same disputes in state court, while leaving HRSA entirely out of the equation.  Just like the claims contemplated in *Astra*, that would destroy the unified control over 340B that Congress established, risk creating the conflicting determinations by state and federal actors that Congress sought to avoid, and "interfere … at an operational level with HHS's enforcement authority." *McCuskey*, 2026 WL 898259, at *12.

### C.    The Remaining Factors Favor Injunctive Relief.

The remaining factors also favor granting preliminary relief.  Maine argues that PhRMA "identified no injury beyond the cost of complying with federal law," ME.Br.52, but ignores PhRMA's assertion (supported by binding precedent) that a regulated entity faces irreparable harm whenever, as here, it faces penalties for failing to comply with a preempted law, *see* PhRMA.Br.51 (citing authorities). Maine similarly ignores PhRMA members' declarations establishing that Chapter 103 will cause them financial harm, PhRMA.Br.54 (collecting record citations), which cannot be remedied by a damages award against the defendants because they are protected by sovereign immunity, PhRMA.Br.54; *see Rosario-Urdaz v. Rivera-*

*Hernandez*, 350 F.3d 219, 222-23 (1st Cir. 2003); *Missouri v. Trump*, 128 F.4th 979, 996 (8th Cir. 2025).

Because PhRMA is likely to succeed on the merits and has demonstrated irreparable harm, the other equitable factors likewise favor granting relief. PhRMA.Br.54-55.   Maine's contrary arguments (at 52-54) rest on the flawed assumption that Chapter 103 is lawful and does not irreparably injure PhRMA.

## CONCLUSION

This Court should reverse.

Respectfully submitted,

s/Erin E. Murphy
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
PHILIP HAMMERSLEY[*]
CAMILO GARCIA[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

[*] Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Plaintiff-Appellant*

April 22, 2026

28

**CERTIFICATE OF COMPLIANCE
WITH RULE 32(a)**

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,458 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Times New Roman size 14-point font with Microsoft 2016.

Date: April 22, 2026

<u>s/Erin E. Murphy</u>
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Erin E. Murphy</u>
Erin E. Murphy